[No. F053661. Fifth Dist. Oct. 24, 2008.]

SHERYL GRAY et al., Plaintiffs and Appellants, v.
COUNTY OF MADERA et al., Defendants and Respondent;
MADERA RANCH QUARRY, INC., et al., Real Parties in Interest and
Respondents.

**COUNSEL**

Law Offices of Donald B. Mooney, Donald B. Mooney, Marsha A. Burch; Koczanowicz & Donaldson and Martin D. Koczanowicz for Plaintiffs and Appellants.

David A. Prentice, County Counsel, and Douglas W. Nelson, Assistant County Counsel, for Defendants and Respondents.

Law Office of Thomas H. Terpstra and Thomas H. Terpstra for Real Parties in Interest and Respondents.

**OPINION**

**ARDAIZ, P. J.—**

## INTRODUCTION

Sheryl and Bruce Gray appeal from the dismissal of their petition for writ of mandate and complaint for injunctive declaratory relief. For the following reasons, we reverse.

## STATEMENT OF THE CASE

Sheryl and Bruce Gray (Petitioners or Appellants) filed a petition for writ of mandate challenging the decision of the County of Madera and the Madera County Board of Supervisors (collectively the County or Respondents) to issue a conditional use permit and a mining permit, to approve a rezoning, and to

certify an environmental impact report (EIR) in connection with the proposed Madera Ranch Quarry Project (the Project), and to approve the cancellation of a Williamson Act (Gov. Code, § 51200 et seq.) contract for part of the site. In their petition, they contended that Respondents abused their discretion and failed to act in accordance with the applicable laws. Specifically, Petitioners alleged that Respondents' actions violated the California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA) and the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.), the Madera County General Plan and Madera County Code, and the Surface Mining and Reclamation Act of 1975 (SMARA), Public Resources Code section 2710 et seq.

On April 27, 2007, Petitioners filed their opening trial brief. The County filed its response to opening trial brief on May 29, 2007. Petitioners filed their reply brief on June 8, 2007.

On July 25, 2007, the trial court issued its judgment on petition for writ of mandate, denying the petition. On August 10, 2007, the County filed a notice of entry of judgment on petition for writ of mandate.

Appellants timely appealed.

## FACTS

Aggregate is material that is "necessary for a wide range of public works and private-sector construction projects." A 1999 report by California's Department of Conservation, Division of Mines and Geology, projected that demand for aggregate in the Fresno Production-Consumption (P-C) Region, which includes the County of Madera, would be 528 million tons, of which 50 percent or 264 million tons must be of portland cement concrete (PCC) quality. The 1999 report estimated that there were only 93 million tons of presently permitted PCC-grade aggregate resources within the Fresno P-C Region. The report noted that in early 1998, PCC-grade aggregate was being imported from Coalinga. According to the report, Coalinga "has enough aggregate reserves to last well over 100 years at the present rate of production and may be able to serve as an alternative resource for several decades beyond the depletion date of the present Fresno P-C Region reserves. However, the additional haulage distance would add nearly $50 million annually starting in the year 2012—the year after the projected depletion of Fresno P-C Region aggregate reserves."

According to Respondents, the State of California "mandates that a County have mapped enough aggregate resource to meet its needs." However, "[c]urrently Madera County does not have an approved aggregate source. The

County is hauling aggregate in from Coalinga, and Le Grand." According to Respondents, the project at issue sought to meet the need for a local source of aggregate by providing about 10 percent of the projected regional demand for aggregate.

## I.

## CEQA PROJECT

In 2000, real parties in interest, Madera Ranch Quarry, Inc., and W. Jaxon Baker (collectively Baker) began looking for an aggregate reserve site in Madera County. They settled on the Project site in 2002, purchased the property, and applied for conditional use permit (CUP) 2002-20, a hard rock mining permit.

The CUP would allow Baker to develop a hard rock quarry, the Madera Ranch Quarry. The Madera Ranch Quarry site is located on approximately 125 acres of the 540-acre Madera Ranch. "The Project site is located in central Madera County, California, about two miles west of State Route (SR) 41, four miles north of SR 145, and 16 miles northeast of the City of Madera." The Madera Ranch is subject to a Williamson Act contract. The Williamson Act, Government Code section 51200 et seq., is a legislative effort to preserve agricultural land. (Gov. Code, § 51220.) Baker filed a notice of nonrenewal of the Williamson Act contract for the Project site in 2003. As part of the Project approval application, Baker proposed to cancel the Williamson Act contract on the Project site and to place 132 acres to the north of the Project site into a conservation easement.

Before approval, the Project area was zoned for agriculture use (Agricultural, Rural, Exclusive-40 acres or ARE-40) and was used for grazing and wildlife habitat. With the approval of a CUP, mining is an allowed use for areas zoned ARE-40. However, Baker, at the request of the County, applied for a zoning change to a "Quarry, Mining, Drilling" (QMD) designation to address potential land use compatibility issues relating to the proposed construction and use of a hot-mix asphalt batch plant. Areas zoned as QMD are permitted accessory uses such as a hot-mix asphalt plant with a CUP. As part of the project, Baker also applied for CUP 2006-001, which would permit the building of a 35-acre hot-mix asphalt batch plant.

The Project thus includes the excavation pit, which could encompass 86 acres of the site upon completion, and the construction and operation of "an aggregate processing facility, hot mix asphalt plant, administration complex, parking areas, on-site access road, and various other stockpile and processing areas. The Project would also include construction of a two-lane paved access

road from the process area west about a quarter of a mile out to County Road 209. As proposed, the Project also would include substantial upgrading and realignment of [County] Road 209 to meet County and Caltrans's Standards."

Baker would be permitted to mine 900,000 tons per year of aggregate material for the next 50 years, through two mining phases. "A total of about 45 million tons . . . of marketable material would be mined over the life of the Project." The Project will allow up to 320 truck round trips per day to deliver the mined aggregate, and will result in estimated water consumption of 72,000 gallons per day. "At the conclusion of aggregate production, a three-year final reclamation phase would extend the total Project lifespan to about 53 years. Certain reclamation activities would be ongoing throughout the operational life of the Quarry."

On October 24, 2006, the County granted Baker's application for CUP 2002-20 (hard rock mining permit) and CUP 2006-001 (hot-mix asphalt plant), rezoning of the Project area, and cancellation of a Williamson Act contract.

Although the Project site contains aggregate, it has not been classified by the State Geologist into mineral resources zones, as required by SMARA, Public Resources Code section 2761 et seq. The Project site also includes areas that can serve as habitats for a number of special-status species. Three known populations of Ewan's larkspur exist near the quarry pit, and habitats for the western pond turtle and California tiger salamander exist along County Road 209 and at the mine site.

The area surrounding the Project is "zoned agricultural[] and [is] and will continue to be used primarily for cattle grazing." Also, there are dozens of residences and 55 domestic wells within one mile of the Project. In its May 25, 2006 staff report, the County of Madera Planning Commission stated that "[t]here is concern that over the life time of the mine[,] surrounding property owners might suffer declined well pumping rates caused by the mining operation."

## II.

## CEQA PROCESS

The County, as the lead agency for the CEQA project, prepared an initial study for the Project to identify issues to be evaluated in the draft EIR (DEIR). After the DEIR for the Project was completed, the County circulated the DEIR between June 24, 2005, and August 15, 2005, for public comment. During that time period, the County received approximately 175 timely letters

from various government agencies and members of the public that commented on the DEIR. The comment letters identified or alleged numerous deficiencies in the document, including its failure (1) to accurately describe the Poject, or (2) to adequately analyze the impacts of the Project on water supply, water quality, noise, air quality, traffic, endangered species habitat, aesthetics, and impacts to land use.

For example, the California Regional Water Quality Control Board (RWQCB) submitted two comment letters. In the August 5, 2005 letter, the RWQCB warned that certain activities on the Project would require compliance with various laws and regulations and water quality control plans. The August 18, 2005 letter identified certain concerns that the agency had with the mitigation measures. California's Department of Fish and Game commented in detail on the adequacy of mitigation measures to protect biological resources. With respect to the California tiger salamander, the agency recommended "the applicants retain a qualified biologist to conduct a complete site assessment for the salamander at the appropriate time of year using the methodology prescribed in the joint California Fish and Game-U.S. Fish and Wildlife Service (Service) 'Interim Guidance on Site Assessment and Field Surveys for Determining Presence or a Negative Finding of the Tiger Salamander' (October 2003)." Many neighboring property owners submitted comments describing the impacts to their property value that would occur as a result of the Project.

Petitioners submitted a 16-page letter with detailed comments about the DEIR within the 45-day comment period. In their letter, Petitioners alleged that the Project did not comply with the County's general plan, and that the DEIR did not adequately analyze cumulative impacts, traffic, hydrology/water, aesthetics, air quality, endangered species habitat, and feasibility and effectiveness of proposed mitigation measures.

The DEIR author prepared responses to these comments, including a detailed response to concerns regarding the California tiger salamander, and only made minor revisions to the text of the DEIR. Collectively, the comment letters, the responses to the comments and the minor revisions to the DEIR as shown by a black-lined version of the DEIR comprised the final EIR (FEIR), which was released on February 15, 2006.

The planning commission held its first public hearing on the Project on February 22, 2006. The hearing was continued until March 28, 2006.

On March 22, 2006, Petitioners sent a letter to the planning commission with additional comments on the Project. They attached a March 19, 2006 opinion letter from their expert, Dr. Robert J. Sterrett, on the inadequacy of the analysis of hydrology/water in the DEIR and FEIR (the Sterrett Letter).

The planning commission held the March 28 hearing, at which it heard hours of public testimony on the project. On May 25, 2006, the planning commission voted four to one to approve the CUP's and to recommend that the board of supervisors approve the requested rezoning application and the cancellation of the Williamson Act contract.

On June 1, 2006, Petitioners appealed the planning commission's determination to the board of supervisors (Board). On July 11, 2006, Petitioners submitted further comments on the FEIR, arguing that the FEIR did not adequately respond to the deficiencies in the DEIR identified by the agencies and the public during the review process. Petitioners also attached a July 10, 2006 noise study report prepared by the Morro Group.

Respondents have contended and are contending that both of Petitioners' expert opinions, but especially the "Morro Group Report," are untimely.

On July 17, 2006, the Board held a public hearing on the Project. On September 11, 2006, the Board held another public hearing on the Project. Finally, on October 24, 2006, the Board considered and denied the appeal, approved the Project, certified the EIR for the Project, and adopted its CEQA findings of fact, mitigation and monitoring program and statement of overriding considerations. The Board rejected the Sterrett Letter and Morro Group Report as untimely, and in the alternative, considered and rejected them.

## DISCUSSION

On appeal, Petitioners challenge the County's approval of the CUP's on both CEQA grounds and non-CEQA grounds. We discuss the issues on appeal related to CEQA first.

### I.

### CEQA ISSUES ON APPEAL

### A.

### STANDARD OF REVIEW

Public Resources Code sections 21168 and 21168.5 provide the standard of review applied by courts in "[a]ny action or proceeding" challenging an agency decision under CEQA. Under both sections, a court's review of that agency decision is limited to two questions: (1) Whether there is any substantial evidence in light of the whole record to support the decision; and

(2) whether the agency abused its discretion by failing to proceed in the manner required by law. (Pub. Resources Code, §§ 21168, 21168.5;[1] *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) Thus, "[i]n reviewing challenges to the certification of an EIR or approval of a CUP, the court must determine whether the lead agency abused its discretion by failing to proceed in a manner required by law or by making a determination or decision that is not supported by substantial evidence." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390 [133 Cal.Rptr.2d 718] (*Irritated Residents*); see § 21168.5.) "A court's proper role in reviewing a challenged EIR is not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an information document. [Citation.] Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.]" (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1391.)

 "When assessing the legal sufficiency of an EIR [as an informational document], the reviewing court focuses on adequacy, completeness and a good faith effort at full disclosure. [Citation.] 'The EIR must contain facts and analysis, not just the bare conclusions of the agency.' [Citation.] 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.] Analysis of environmental effects need not be exhaustive, but will be judged in light of what was reasonably feasible. When experts in a subject area dispute the conclusions reached by other experts whose studies were used in drafting the EIR, the EIR need only summarize the main points of disagreement and explain the agency's reasons for accepting one set of judgments instead of another. [Citations.]" (*Irritated Residents, supra,* 107 Cal.App.4th at pp. 1390–1391.)

"As frequently occurs, many of the disputes in this case center on the question whether relevant information was omitted from the [EIR]. Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. (§ 21005, subd. (b).) This court has previously explained, '[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citations.]" (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1391.)

---

[1] All further section citations are to the Public Resources Code, unless otherwise indicated. All citations to CEQA Guidelines are to title 14 of the California Code of Regulations, section 15000 et seq.

" 'Provided the EIR complies with CEQA, the [b]oard may approve the project even if it would create significant and unmitigable impacts on the environment.' " (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1390.) The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. (*Ibid.*)

## B.

## CEQA ISSUES ON APPEAL

Appellants make several general challenges to the County's approval of the Project. Specifically, Appellants contend that the EIR (the DEIR and FEIR collectively) failed to fulfill CEQA's requirement as an informational document and violated CEQA by failing to take into consideration the "whole of the project." Appellants, however, provide no specific arguments or record citations to support these two general challenges. Rather, it appears that these two challenges are incorporated into Appellants' more specific arguments on appeal. Thus, we will address the specific issues raised by Appellants on this last contention, and where appropriate, we will also consider the general challenges. We will also consider the general challenge based upon the informational nature of the EIR when analyzing whether any errors are prejudicial.

### 1.

### Adequacy of Response to Comments

Appellants contend that the FEIR failed to adequately respond to comments on the DEIR that were submitted by the public and government agencies. Under CEQA, the County is required to evaluate comments to the DEIR and prepare written responses. (§ 21091, subd. (d); CEQA Guidelines, § 15088.) However, Appellants rely upon several comments that were submitted after the 45-day comment period for the DEIR. For example, Appellants rely upon an untimely expert opinion, the Sterrett Letter, to attack the DEIR's conclusions about impacts on surface water and groundwater. The Sterrett Letter was submitted on March 22, 2006, to the planning commission, well after the 45-day comment period for the DEIR. The Board rejected the Sterrett Letter as untimely.

█ Under CEQA, the lead agency may, but is not required to, respond to late comments. (§ 21091, subd. (d)(1); CEQA Guidelines, § 15088; *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 925, fn. 10 [45 Cal.Rptr.3d 102] (*Gilroy Citizens*).) Courts have found

that the Board's approval of a CEQA project can be supported by substantial evidence found in the responses to late comments. (See, e.g., *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 567–568 [276 Cal.Rptr. 410, 801 P.2d 1161] [holding that a reviewing court may consider the administrative record, instead of the EIR, when assessing whether substantial evidence supports the board's findings].) However, because the Board never had a legal duty to respond to late comments, the inadequacy of the Board's responses to the late comments is not sufficient to render approval of the CEQA project ineffective or contrary to law. To hold otherwise could discourage lead agencies from addressing and considering late comments. However, although the Sterrett Letter and Morro Group Report are untimely, we will address those allegations of errors that were identified in the untimely expert opinions, as well as in any other late comments, that bear upon the issue of whether there is substantial evidence to support the County's decision to approve the CEQA project because the County has the burden of showing that there is substantial evidence to support its decision. (See *Citizens of Goleta Valley v. Board of Supervisors, supra*, 52 Cal.3d at p. 568 [holding that failure to make a timely comment does not excuse the lead agency from providing substantial evidence to fulfill its duty to identify and discuss project alternatives].)

With respect to whether the County adequately responded to timely comments from the public and governmental agencies, our review of the record indicates that the County did adequately respond to all of the timely comments. However, whether those responses are sufficient to satisfy the County's burden of proof to show that there is substantial evidence supporting its findings and its decision to approve the CEQA project is an issue that will be discussed when we address Appellants' other challenges to the EIR.

2.

### Impacts to Surface Water and Groundwater

Appellants contend that the EIR did not adequately analyze the Project's impacts on surface water and groundwater. They also take issue with the proposed mitigation measures. Finally, they raise concerns about the failure to recirculate the EIR because of an amended mitigation measure and to analyze economic impacts related to the water issues. We address these issues in turn.

a.

### Factual Background

The DEIR concluded that the Project could cause three potentially significant impacts and two less than significant impacts to surface water and

groundwater. First, the Project could cause the water levels and pumping rates in adjacent private wells to decline during the operational life of the quarry. To mitigate this problem, "Mitigation Measure" 3.9-1 requires semi-annual monitoring of water levels and, if an impact is found, replacement of water for nonconsumptive use from existing Madera Ranch wells. Consumptive use would have to come from the remaining production in the private well, or if inadequate, from Mitigation Measure 3.9-1b. That mitigation measure requires Baker to "provide the affected party, or parties, with bottled water or potable water from some other source that is verified to meet state and federal drinking water standards."

Similarly, the Project could cause declines in water levels and pumping rates in adjacent private wells to decline after the operational life of the quarry. To mitigate this problem, there will be semiannual monitoring after the completion of quarry operations. If an impact is found, Baker would provide affected well owner(s) with replacement water, and if necessary, bottled or potable water.

Finally, the Project could cause degradation of groundwater and/or surface water quality from operations. To mitigate this problem, Baker is required to comply with the RWQCB, and to place all fuel and chemical storage areas and all equipment maintenance areas on bermed concrete surfaces.

The DEIR also concluded that the Project would not cause significant impacts to surface water runoff and had no cumulative impacts.

The RWQCB submitted two comment letters that detailed its concerns about the hydrology/water impact portion of the DEIR. In the August 5, 2005 letter, the RWQCB warned that certain activities on the Project would require compliance with various laws and regulations and water quality control plans. The August 18, 2005 letter identified certain concerns that the agency had with the mitigation measures. In response to the letters, the FEIR concluded that many of RWQCB's concerns are addressed by the fact that the conditions of approval for the CUP's would require Baker to submit a report of waste discharge to the RWQCB. For example, the report of waste discharge would provide technical information on how Baker planned to produce and manage the discharge of process wastewater. The FEIR also concluded that many of the RWQCB's other concerns were unfounded because the aquifer was confined. The FEIR also stated that providing replacement water is an effective mitigation measure.

The FEIR similarly responded to the comments by the Department of Conservation and the Department of Fish and Game that raised similar concerns.

The RWQCB submitted a response to the FEIR on March 6, 2006, in which it stated that "[s]imply providing replacement water is not, in our professional judgment, an effective or acceptable mitigation measure." The RWQCB also believed that once the excavation pit is deepened, it would function as a well that could connect the production wells with neighboring wells, thus breaking the confined nature of the aquifer. It recommended that there be additional monitoring beyond that listed in the mitigation measure. Finally, the RWQCB restated its belief that certain technical information about the use of water in the various mining and operation processes should not be deferred to the report of waste discharge application but should be included in the DEIR.

When the Board approved the Project, it modified and clarified Mitigation Measure 3.9-1b to impose a stricter water well monitoring system. Also, "[t]he Board of Supervisors further clarifie[d] Mitigation Measure 3.9-1b, to require the Board of Supervisors to conduct a public meeting if the hydrology in the immediate area has been compromised. If the neighboring wells along Road 406 are adversely affected by the project, the Board of Supervisors will require a hydrology study, and possible water system constructed under federal, state, and county guidelines or any other mechanism for addressing and remediating the problem at applicant's expense." It is this later amendment to Mitigation Measure 3.9-1b that is the basis for several of Appellants' arguments on appeal.

b.

Adequacy of Analysis

In their opening brief, Appellants spend much of their time attacking the DEIR for improperly relying upon a groundwater analysis prepared by Cleath and Associates (the Cleath Report). The Cleath Report tested eight wells on the Project site to determine the impacts on groundwater. Three wells, "Well #1," "Well #4," and "Well #5," were tested individually as production wells. The Cleath Report concluded that the three production wells "appear to tap distinctly different fracture zones and little or no interference between the zones was evident during the pumping tests. The fluoride concentrations in Wells #1 and #5 are high enough to be of concern for use as a drinking water supply but would be an excellent source of water for industrial or agricultural purposes. Well #4 has excellent water quality for drinking water purposes. The recommended discharge rates for the three production wells is 140 gpm for Well #1, 35 gpm for Well #4, and 40 gpm for Well #5; a combined flow of 215 gpm. This combined flow rate, produced on a continuous basis, exceeds the demand for the proposed rock plant."

Appellants alleged the following errors with the Cleath Report: "The pumping rates that are being assumed for various wells are inconsistent with the report of data provided by the Project applicant. Variations of over 100 gallons per minute ('gpm') may be noted. The Cleath Report states that additional investigation is necessary due to the presence of springs and seeps that could be impacted on the property. The EIR, however, states that the aquifer is 'confined' and that the mining activities will not result in the impacts predicted by Dr. Sterrett, the USFWS[2] and the RWQCB."

Thus, according to Appellants, the two errors that undermine the Cleath Report are: differential pumping rates and whether the aquifer is confined. However, a review of the Cleath Report and the cited page from the Sterrett Letter does not support Appellants' argument. First, Sterrett himself states that the applicant failed to follow the recommendations in the Cleath Report to pump 140 gpm (gallons per minute) from Well #1 and 40 gpm from Well #5, but would instead draw 250 gpm from Well #1 and 60 gpm from Well #5. This is not a criticism of the Cleath Report; rather, it is a criticism of the applicant's planned water use. The Cleath Report actually did pumping tests at 250 gpm for Well #1 and 60 gpm for Well #5. Moreover, Sterrett neglects to mention that the Cleath Report recommended a draw of 35 gpm from Well #4, a production well that has "excellent water quality," and "[t]he only source which could have some impact on non-project wells . . . ." It thus appears that not drawing from Well #4, but drawing more heavily from Well #1, would be beneficial to nearby residents and future owners of the Project site.

Further, the Cleath Report does not say that the aquifer is not confined or that further investigations are necessary. Rather, the Cleath Report states: "All of the production wells are located in the proximity of seeps and springs. Some of these are intermittent and others flow year round. The operation of the wells will lower ground water levels and probably decrease some of this flow. During the pumping tests, no reduction in spring flow was observed, but it is difficult to quantify any such impacts when flow is low or intermittent." From these statements, we can infer that Cleath believes that the seeps and springs may be impacted, but that it found no evidence from its tests; however, we cannot infer that Cleath believes that more investigations would be able to determine whether there would or would not be an impact. In any event, whether or not the seeps and springs would be impacted does not lead to a conclusion that the aquifer is not confined. The Cleath Report states that it believes that the three production wells tap distinctly different fracture zones that, with the possible exception of Well #4, do not impact neighboring

---

2 Although it does not change our analysis, we note that the USFWS (U.S. Fish and Wildlife Service) did not comment; rather, California's Department of Fish and Game commented, with a carbon copy of the comment letter sent to the USFWS.

private wells. That is substantial evidence to support the conclusion of the FEIR that Wells #1 and #5 are part of a confined fractured granitic bedrock.

In their reply brief, Appellants also contend that the County is being disingenuous about whether the aquifer providing water to the Project wells is confined or not confined. However, our review of the record indicates that the County has always considered the aquifer to be confined as a whole. The evidence indicates that the aquifer is not a solid body of water but is instead a group of fractures in granitic bedrock containing water. The group of fractures is self-contained and does not connect to another water system or aquifer. Thus, the County could conclude that the aquifer is confined.

Appellants next contend that the County should have done additional testing because it would have been feasible to do additional testing and the Cleath Report recommended additional testing. However, the feasibility of additional testing is not sufficient to require the County to do additional testing. Rather, the additional testing is required only if the initial testing is insufficient. As this court has stated, "CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project. The fact that additional studies might be helpful does not mean that they are required." (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1396.) Here, we have rejected Appellants' attacks on the Cleath Report. Thus, there is no need for additional testing based upon Appellants' arguments. However, additional testing may be required to address some of the concerns that we will raise in this opinion.

c.

Adequacy of Mitigation Measures

Appellants further contend that the proposed mitigation measures are inadequate to address the potential and significant impacts of the Project on water resources. We agree that there is no substantial evidence to support the EIR's conclusion that the proposed mitigation measures are adequate.

Mitigation Measure 3.9-1a provides that in the event of an adverse impact on water levels of neighboring private wells, Baker will have three mitigation options: (1) rehabilitate or deepen the private wells; (2) provide incremental replacement water by providing a connection to the water system of the Project; or (3) provide full replacement water by providing a connection to the water system of the Project.

Mitigation Measure 3.9-1b originally provided that, if Mitigation Measure 3.9-1a does not supply a sufficient amount of water for consumptive use,

Baker would have to supply replacement water for consumptive use in the form of bottled water or "potable water from some other source that is verified to meet state and federal drinking water standards." The record indicates that Baker also was willing to supply large water tanks filled with potable water. It is unclear why the Board did not include this mitigation option in its conditional approval of the Project. Rather, the Board amended the measure to require a hydrology study and to allow the option of building a "water system constructed under federal, state, and county guidelines" to supply potable water to affected neighbors. The record does not indicate that this mitigation option was ever extensively discussed with County staff or with Baker. This mitigation option also was never discussed in the DEIR or FEIR, and thus there was no analysis of this mitigation option.

Appellants contend that Mitigation Measures 3.9-1a and 3.9-1b are inadequate because (1) they are not fully enforceable, (2) there is no substantial evidence that the measures are feasible or effective, (3) impacts associated with the implementation of the measures themselves were not analyzed in the EIR, and (4) Mitigation Measure 3.9-1b, as amended, improperly defers formulation of specific mitigation strategies until after Project approval. We disagree with Appellants on their first argument, but agree with them on their remaining arguments.

The mitigation measures are enforceable because they were incorporated as part of the conditional approval for the CUP's. (See § 21081.6, subd. (b) [requiring mitigation measures to be "fully enforceable through permit conditions, agreements, or other measures"].) Appellants' argument appears to be that the mitigation measures are too vague to be enforceable. However, the mitigation measures are not so vague as to be unenforceable. There is no need, as Appellants would require, for the mitigation measures to specify the exact amount of bottled water required per person per day. The fact that the mitigation measures require replacement water sufficient for consumptive use is sufficiently specific for the mitigation measures to be legally enforceable. However, the vagueness of the mitigation measures impacts our analysis of their viability and effectiveness.

We agree with Appellants that there is no substantial evidence that the mitigation measures are feasible or effective in remedying the potentially significant problem of decline in water levels of neighboring wells. In order to mitigate this problem into a less than significant problem, Baker must present a viable solution that can effectively replace the decline in the water available to the neighboring residents. Although Respondents contend that we should defer to the Board's finding that the mitigation measures are effective, we decline to do so where the Board's findings are not supported by substantial evidence or defy common sense. Law is not required to abandon

common sense. Here, our common sense informs us that the mitigation measures will not effectively replace the water that could be lost by the neighboring landowners. It is true that the mitigation measures will provide a replacement for the lost amount of water. However, neither Mitigation Measure 3.9-1a nor Mitigation Measure 3.9-1b will provide neighboring residents with the ability to use water in substantially the same manner that they were accustomed to doing if the Project had not existed and caused a decline in the water levels of their wells.

Mitigation Measure 3.9-1a provides that Baker could rehabilitate or deepen the neighboring wells to provide additional water. But there is no substantial evidence to conclude that the neighboring wells would provide additional potable water. Mitigation Measure 3.91a also would, as the RWQCB has stated and the DEIR acknowledges, permit Baker to replace the lost water by providing a connection to the Project wells. The DEIR concedes that water from the Project wells is not acceptable for consumptive uses, and already provides that water for consumptive use would come from the remaining production in private wells, or through Mitigation Measure 3.9-1b. Thus, the neighboring residents would have to change their water usage to use the water from their private wells for consumptive purposes only and the water from the Project wells for other uses. Besides this inconvenience, neighboring landowners may also need to comply with regulatory oversight because of their use of the nonpotable water, for example in landscape irrigation, which may require the neighboring landowners to mitigate and remediate any degradation to underlying groundwater. In the FEIR, the County contends that the DEIR "demonstrates that the water-bearing fractures beneath the area are under confined conditions and that surface water does not locally recharge." Thus, according to the County, neighboring landowners would not have to comply with any regulatory oversight because the runoff from the use of nonpotable water would not interact with the confined aquifer supplying drinking water. We are unclear whether the County's interpretation of when regulatory oversight would apply is correct. However, of more concern is that there is no substantial evidence to conclude that the aquifer that supplies water to the Project and to the neighboring wells, which is currently confined, would remain confined over the operational life of the Project. According to the RWQCB, as the pit is excavated, it may function as a well that could connect the production wells with neighboring wells. Thus, the neighboring landowners could be subject to regulatory oversight in the future. The County has stated that the Project well water could be treated to make it potable, but the mitigation measure does not require Baker to treat the water. Therefore, Mitigation Measure 3.9-1a is not viable because it does not replace the lost water from private wells with a substantially similar quality of water.

Similarly, Mitigation Measure 3.9-1b is not viable. We agree with the RWQCB that providing replacement water through bottled water is not a

viable or effective mitigation measure. It defies common sense for the County to conclude that providing bottled water is an effective mitigation measure. As presented, Mitigation Measure 3.9-1b does not explain how and in what amount the bottled water will be delivered to the neighboring landowners. The measure requires replacement at least equal to the lost amount of water production from the landowners' wells. However, some if not all of the landowners will have fluctuating water usage. In some weeks, they may use a lot of water because of drought conditions, extra guests, or farming needs. In other weeks, landowners may use very little water. Often, landowners will be unable to predict their amount of water needs in advance. It is also unlikely that neighboring landowners have water meters that will help them to calculate their water usage. Mitigation Measure 3.9-1b does not explain how it will address the issue of fluctuating water usage by supplying bottled water. A water system, as proposed by the Board, could solve this problem. However, the proposal for a water system was never studied by the County staff. Thus, there is no substantial evidence that it is feasible to build a water system. Therefore, Mitigation Measure 3.9-1b does not present viable mitigation options.

Furthermore, the EIR does not address the potentially significant impacts associated with Mitigation Measure 3.9-1a and Mitigation Measure 3.9-1b. For example, the EIR fails to explain how the use of nonpotable water to irrigate the land, which Baker is permitted to supply to the neighboring landowners under Mitigation Measure 3.9-1a, would have an impact on livestock, wildlife and habitats. With respect to Mitigation Measure 3.9-1b, the EIR does not explain how the water bottles that are used will be replaced or recycled. The EIR also fails to examine whether building a new water system would cause significant environmental impacts.

Finally, we conclude that Mitigation Measure 3.9-1b improperly defers formulation of specific mitigation strategies. "Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. [Citation.]" (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275 [15 Cal.Rptr.3d 176].) According to Respondents, there is no improper deferral because the County has committed to a mitigation goal of remedying the decline in water levels of private wells and has listed various mitigation alternatives that can address this problem. Respondents contend that CEQA does not require that they specifically detail the mitigation alternatives. (See, e.g., *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028–1029 [280 Cal.Rptr. 478] [" '[F]or [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy

specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. [Citations.]' "].)

While we generally agree that CEQA permits a lead agency to defer specifically detailing mitigation measures as long as the lead agency commits itself to mitigation and to specific performance standards, we conclude that here the County has not committed itself to a specific performance standard. Instead, the County has committed itself to a specific mitigation goal—the replacement of water lost by neighboring landowners because of mine operations. However, this goal is not a specific performance standard such as the creation of a water supply mechanism that would place neighboring landowners in a situation substantially similar to their situation prior to the decline in the water levels of their private wells because of the mining operations, including allowing the landowners to use water in a substantially similar fashion to how they were previously using water. Moreover, the listed mitigation alternatives must be able to remedy the environmental problem. We have concluded that the listed mitigation alternatives, except for the building of a new water system, cannot remedy the water problems because they would not place neighboring landowners into a situation substantially similar to what the landowners experienced prior to the operation of the mine. And the option to build a water system, which is the only effective mitigation measure that was proposed if it was feasible, was never studied or examined. Thus, the County is improperly deferring the study of whether building such a system is feasible until the significant environmental impact occurs.

The County could have approved the Project even if the Project would cause significant and unavoidable impacts on water despite proposed mitigation measures if the County had adopted a statement of overriding considerations that made such findings. However, the County did not do so. Rather, the County concluded that the proposed mitigation measures rendered the water issues less than significant. We are rejecting the County's conclusion on the water issues because we have concluded that the mitigation measures that were proposed to address the potentially significant adverse impacts on the water levels of private wells of neighboring landowners are not viable or effective. The mitigation measures do not allow the landowners to use water in a manner substantially similar to how the landowners are currently using water because the mitigation measures (1) would allow Baker to replace potable water with nonpotable water, (2) could expose the landowners to new regulatory oversight in the use of their water, (3) would create a water supply system that does not reliably provide water at the times and in the amount needed by the neighboring landowners, and (4) could cause new and potentially significant impacts on the environment. The only mitigation option that

would address many of these problems is the proposal to build a new water system, but there is no substantial evidence to conclude that this option is even feasible. Thus, the mitigation measures are inadequate under CEQA.

d.

### Recirculation of EIR

█ Appellants further contend that the County failed to comply with the procedural mandates of CEQA by failing to recirculate the EIR despite the emergence of significant new information, which was the amendment to Mitigation Measure 3.9-1b. "If significant new information is added to an EIR [or to the administrative record], the lead agency must issue a new notice and recirculate the EIR for comments and consultation." (Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2005) § 16.15, p. 786 & § 16.16, pp. 790–791; see also § 21092.1; CEQA Guidelines, § 15088.5.) Given that there was no analysis done on whether the option to build a water system is a feasible mitigation measure, we conclude that the portion of the EIR addressing water concerns should have been recirculated.

e.

### Economic Impacts

Finally, Appellants contend that the County failed to adequately address the economic impacts on neighboring landowners due to the potentially significant impact on the water levels in their private wells as required by CEQA. We disagree that CEQA imposes such a requirement, and Appellants cite no authority that supports this position.

█ Section 21061.2, cited by Appellants provides: " 'Land evaluation and site assessment' means a decisionmaking methodology for assessing the potential environmental impact of state and local projects on agricultural land." We cannot interpret a duty to evaluate economic impact from that section. CEQA Guidelines, section 15064, subdivision (c), also cited by Appellants, provides: "In determining whether an effect will be adverse or beneficial, the lead agency shall consider the views held by members of the public in all areas affected as expressed in the whole record before the lead agency. Before requiring the preparation of an EIR, the lead agency must still determine whether environmental change itself might be substantial." Again, we cannot discern how this supports Appellants' position. Rather, CEQA requires that the lead agency analyze any significant physical changes that

may be caused by social or economic impacts that are the result of the Project. (Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 13.24, p. 634.) Economic and social effects may be considered, but by themselves, are not treated as significant effects on the environment. (CEQA Guidelines, § 15131, subd. (a).) Here, Appellants present no evidence that any significant physical changes to the environment will result from any loss in the property value of neighboring lands that will arise from a potential decline in water levels in private wells. Thus, the County was not required to address the economic impacts of the Project.

2.

Impacts to Traffic

Appellants contend that the EIR failed to adequately analyze the Project's impacts on traffic because it improperly deferred mitigation measures relating to traffic. We agree.

The DEIR concludes that the Project could result in increased vehicle trips or traffic congestion, including substandard level of service. To address this problem, Mitigation Measure 3.12-1a requires Baker to construct intersection improvements with oversight by Caltrans (Dept. of Transportation), or to pay Caltrans to construct the intersection improvements. The mitigation measure lists four specifically required improvements. Baker also is required to post signs specifying designated haul routes for all transporters and delivery vehicles.

The DEIR also concludes that the Project could increase vehicle trips or traffic congestion during the reconstruction of County Road 209. The mitigation measures to address this problem require Baker to complete reconstruction of County Road 209 within two years and implement specified traffic control.

Finally, the DEIR requires Baker to "[c]ontribute an equitable share of the cost of construction of future improvements if requested by Caltrans or Madera County" and to pay a long-term maintenance fee based upon annual aggregate tonnage mined. (See Mitigation Measure 3.12-3a.) The DEIR provides a formula for calculating the equitable share percentage but no formula for the maintenance fee.

Appellants contend that this last mitigation measure violates CEQA because (1) it is not enforceable; (2) it illegally defers development of the details and performance standards; and (3) no substantial evidence supports the conclusion that the "fair share" fees will actually be spent on mitigation.

In support of these three suppositions, Appellants complain that "[t]here is nothing in the mitigation measures that requires Caltrans or Madera County to actually impose impacts fees." Also, "[t]he EIR fails to include any discussion of how or when the possible mitigation fees would be collected or spent, nor does it identify the extent to which the mitigation measure would alleviate the traffic impacts if some fair share fees were ultimately imposed." Finally, "the County made no finding regarding the limitation or the feasibility of the County guaranteeing funding for roadway improvement." We generally agree.

 Assessment of a traffic impact fee is an appropriate form of mitigation when it is linked to a reasonable plan for mitigation. (Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 14.14, p. 700; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 141 [104 Cal.Rptr.2d 326].) Here, the assessment of an equitable share of costs of construction of future improvements and of a maintenance fee is deferred to the future. "Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. [Citation.]" (*Defend the Bay v. City of Irvine, supra*, 119 Cal.App.4th at p. 1275.) According to Respondents, the record, through two Caltrans letters, shows that "while Caltrans has not identified a specific plan for the Highway 41 improvements, there is a clear methodology for collecting fees from the Madera Quarry project and other affected projects, and a sufficient commitment to completing the improvements." We disagree. The letters show intent to make improvements but no definite commitment on when the improvements will take place. Moreover, there is no substantial evidence that Caltrans is committed to scheduling the improvements to State Route 41 in a way that would mitigate the increase in vehicle traffic, for example by scheduling the improvements earlier and more often. Furthermore, there is no evidence that the County has a mitigation plan in place involving the improvement or maintenance of the various local roadways because of the increased vehicle traffic. Thus, the mitigation measures relating to traffic impacts are inadequate.

3.

Noise Impacts

Appellants also contend that the EIR failed to adequately analyze the Project's impacts on noise levels because it relied upon an incorrect methodology in determining significance of noise levels. We agree.

The DEIR concludes that the Project could cause an increase of offsite traffic noise. According to the DEIR, except at one residence which will be

exposed to approximately 16 dBA (decibels in A-weighted sound level scale) increase in traffic noise level, "the project-related traffic noise level increase over non-project levels will be 2.1 dB or less. Because a 3-5 dB increase in traffic noise levels is commonly required to identify noise impacts, this impact is considered less than significant." With respect to the one residence, it was unclear whether any mitigation measures were feasible because the owner refused to cooperate with the County. Thus, the County concluded that the impact on this one residence was significant and unavoidable.

Appellants contend that the analysis in the DEIR was erroneous based upon errors identified in the Morro Group Report. Respondents contend that the Morro Group Report was untimely submitted, and completely rebutted by County staff and the EIR author. In reply, Petitioners contend that the County improperly concluded that a 3-to-5 dBA threshold is required before noise impacts can be found to be significant.

We agree with Appellants that there is no single noise increase that renders the noise impact significant. (See, e.g., *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1026 [68 Cal.Rptr.2d 367] [holding that an increase of 2.8 dBA could be significant where the noise level around the school was already beyond a maximum safety level].) Here, the Madera County General Plan noise element establishes that for residential uses affected by transportation noise sources (offsite traffic in this case), 60 dBA Ldn (day-night average noise level) is the maximum acceptable noise level. All of the sites tested for State Route 41, however, show that existing traffic noise levels are already in excess of this amount. Thus, the EIR should consider whether the cumulative noise impact would be significant when increases of up to 2.1 dBA are added to the existing noise level. For example, even though a 2.1 dBA noise in isolation will not be noticeable, when added to an already high noise level, it could cause a tipping point of noise problems for the general public. The EIR, however, does not analyze this issue and merely concludes that it would not be significant because "[i]t is generally recognized that an increase of at least 3 dB is usually required before most people will perceive a change in noise levels." This bare conclusion cannot satisfy the requirement that the EIR serve as an informational document. Moreover, the Board's statement of overriding considerations, which explained why the Project should still be approved despite a significant impact on noise levels, does not assist the County because it only considered one residence where the noise impact is significant and unavoidable and did not consider the potentially significant impact of cumulative noise level. Thus, the EIR failed to adequately analyze the Project's impact on noise levels.

4.

Impacts to Biological Resources and Wildlife Habitat

Appellants further contend that the EIR failed to adequately analyze the Project's impacts on the biological resources and wildlife habitat because it relied upon an incorrect methodology in determining the significance of the Project on the California tiger salamander. We disagree.

The DEIR concludes that there were potentially significant impacts on the valley elderberry longhorn beetle, the three known populations of Ewan's larkspur, the western pond turtle, the golden eagle, the red tail hawk, protected species of nesting birds, protected species of migratory birds, "waters of the U.S.," and special-status plants including native oak trees. The DEIR also described mitigation measures to address these potential impacts. The DEIR did not include a section on the California tiger salamander because "it was determined that the Project would not adversely impact the California tiger salamander (CTS)" based upon "a report . . . prepared by Mr. Michael Baumgardner following a one day biological resources assessment of portions of the Project Area."

California's Department of Fish and Game (CDFG) submitted a comment letter stating that the report by Baumgardner which found that there were no California tiger salamanders (CTS) did not comply with "methodology prescribed in the joint California Fish and Game—U.S. Fish and Wildlife Service (Service) 'Interim Guidance on Site Assessment and Field Surveys for Determining Presence or a Negative Finding of the Tiger Salamander' (October 2003)."

In response to the CDFG letter, "supplemental biological surveys were conducted regarding the Project's potential for impacts on CTS. These supplemental evaluations supported the EIR's earlier conclusions regarding potential impacts on CTS." The supplemental evaluations consisted of a survey of an additional seven perennial ponds that were not addressed in the Baumgardner report. Evidence from these surveys indicated the presence of creatures that are implicated in the extirpation of CTS. "Furthermore, legal access as obtained on December 30, 2005 to the private pond in which CTS had previously been documented in 1973. [The County] was subsequently able to also document presence of introduced predatory fishes (black bass and bluegill) in this pond. Thus, the available evidence suggests that none of the ponds within 1.3 miles of the mine site is considered suitable as aquatic breeding habitat for CTS."

■ On appeal, Appellants contend that these biological surveys are inadequate. Rather, the only adequate study was the one recommended by the CDFG in its comment letter, which would require that "at sites that contain both upland habitat and potential breeding habitat, sampling must occur during two breeding seasons and a drift fence study during the intervening winter." We disagree that CEQA requires the County to follow the study protocols suggested by the interim guidance. As this court has stated, "CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project. The fact that additional studies might be helpful does not mean that they are required." (*Irritated Residents, supra*, 107 Cal.App.4th at p. 1396.) Here, the biological surveys that were carried out are sufficient to constitute substantial evidence to support the finding that there would be no significant impacts on CTS. Moreover, requiring a study that takes place over two winters could conflict with the requirement that EIR's for private projects be prepared and certified within one year. (§§ 21100.2, 21151.5; CEQA Guidelines, § 15108.)

5.

Impacts to Air Quality

Appellants also contend that the EIR failed to adequately analyze the Project's impacts on air quality because it relied upon an incorrect methodology. We disagree.

The DEIR concludes that the Project would generate, from excavation activities and associated traffic, particle matter (PM-10), oxides of nitrogen (NOx) and reactive organic compounds (ROG's) emissions, and that the emissions would be significant and unavoidable. Nevertheless, the DEIR provides seven mitigation measures to reduce or limit these project emissions. The DEIR also concludes that the Project, in combination with other cumulative development, would not significantly increase toxic air contaminant from diesel-powered engines.

Appellants contend, however, that the EIR erred in reaching its conclusion that the Project would not significantly increase toxic air contaminant from diesel-powered engines because it did not include diesel emissions from transport trucks that occurred offsite and many miles away (that is, secondary emissions). Respondents contend that the EIR did contain such data, and that the exclusion of secondary emissions occurred with the EIR's health risk assessment. In reply, Appellants contend that the EIR could not properly exclude secondary emissions in its health risk assessment.

 We have previously held that health impacts associated with increased air pollution should be analyzed in an EIR. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1219 [22 Cal.Rptr.3d 203].) Here, we conclude that there is substantial evidence to support the decision to exclude secondary emissions in the health risk assessment because the model used to calculate health risk uses an air dispersion model. Secondary emissions would result in a lower concentration of toxic air contaminants as the diesel emissions would be averaged over a larger area. Thus, we reject Appellants' challenge on this issue.

6.

Impacts to Aesthetics

Appellants further contend that the EIR failed to adequately analyze the Project's impacts on aesthetics because it improperly deferred a mitigation measure relating to lighting and glare. We disagree.

The DEIR concludes that the Project could potentially generate extended lighting and glare from nighttime loading and hauling operations. The DEIR notes that mining operations will generally only occur during daytime hours. However, there may be occasions where loading and hauling will occur at night to meet the demands of Caltrans and other agencies. In addition, nighttime operations may be required because Pacific Gas and Electric could restrict operations during daytime peak power periods. To mitigate lighting and glare problems on these occasions, the DEIR provides that: "Exterior lighting shall be designed and maintained in a manner such that glare and reflections are contained within the boundaries of the parcel, and shall be hooded and directed downward and away from adjoining properties and public rights-of-way. The use of blinking, flashing or unusually high intensity or bright lights shall not be allowed. All lighting fixtures shall be appropriate to the use they are serving, in scale, intensity and height. Further, all exterior lighting will be designed, installed and operated as required by the Planning Director." (Italics omitted.)

Appellants contend that this mitigation measure is inadequate because it "does not define the level of lighting, the nature or type of lights, any limitations on how frequently the lights may be used and impermissible [*sic*] defers development of a lighting plan to the future." We disagree that there was improper deferral. Here, the mitigation measures show that the County has committed itself to mitigation and to specific performance standards. Specifically, the mitigation measure requires that Project lighting be hooded

and directed away from adjacent properties and towards the Project site. More specific details of the lighting plan may be deferred until the quarry and its required buildings and plants are built and the placement of lights is determined. (See, e.g., *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1366 [84 Cal.Rptr.2d 563] [holding that the lead agency could defer determination of placement of desert-tortoise-protecting fences until further study on migration patterns during operation of the project].)

7.

Cumulative Impacts

Appellants contend that the EIR failed to adequately analyze the Project's cumulative impacts. We agree.

According to the DEIR, "[t]he County Planning Department was contacted for other projects for which applications have been filed, or which have been recently approved, but not yet constructed through June 1, 2004. CEQA establishes that the environment for which the Project is evaluated is established at the time of issuance of the Notice of Preparation (Guidelines Section 15130(b)), which was issued February 10, 2003." "The County Planning Department does not identify any newly permitted or proposed projects in the vicinity that could result in cumulative impacts when considered in concert with the proposed Project. Therefore, the cumulative impacts analyses provided in each section of this Draft EIR focuses on past projects as well as planned growth as outlined in applicable planning documents (e.g., Madera County General Plan)."

■ Appellants contend that this is error because "[t]he County was aware of the expansion plans for the Chukchansi Casino, the River Ranch Development, Gateway Village, and a number of other projects." However, mere awareness of proposed expansion plans or other proposed development does not necessarily require the inclusion of those proposed projects in the EIR. Rather, these proposed projects must become "probable future projects." (CEQA Guidelines, § 15130, subd. (b)(1)(A).) As noted in *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 74 [198 Cal.Rptr. 634], "probable future projects" can be interpreted as reasonably probable future projects. The court found that projects that are undergoing environmental review are reasonably probable future projects. (*Ibid.*) We conclude that any future project where the applicant has devoted significant time and financial resources to prepare for

any regulatory review should be considered as probable future projects for the purposes of cumulative impact. Here, the County could not locate any project where an applicant has filed for review with the county planning department. That is substantial evidence to support the exclusion of any planned expansions allegedly known by the County.

██ Appellants also contend that the County could not arbitrarily choose a deadline of June 1, 2004, as the cutoff date to decide what projects to include in the cumulative analysis. However, since "Projects are constantly being fed into the environmental review process[,] [t]he problem of where to draw the line on 'projects under review' that must be included in the cumulative impact analysis of a particular project could be solved by the use of a reasonable cutoff date which could be set for every project according to a standard procedure." (*San Franciscans for Reasonable Growth v. City and County of San Francisco, supra*, at p. 74, fn. 14.) Thus, the County had the discretion to set the date of the application for the current Project as the cutoff date to determine which projects should be included in the cumulative impacts analysis.

██ Finally, Appellants contend that the County did not follow the CEQA Guidelines in providing and specifying the location where the planning documents could be viewed by the public. (See CEQA Guidelines, § 15130, subd. (b)(1)(B) ["Any such planning document shall be referenced and made available to the public at a location specified by the lead agency."].) Here, the DEIR only referenced the Madera County General Plan. It also did not specify where the Madera County General Plan could be located. The lead agency has the duty to specify all of the planning documents that are being used in the cumulative impacts analysis, and to specify where those planning documents can be publicly viewed. Our review of the DEIR and FEIR indicates that planning documents (except for the Madera County General Plan) were not listed in the cumulative projects section or in the individual cumulative impacts sections. The lack of evidence on what planning documents were used leads us to conclude that there is no substantial evidence supporting any of the cumulative impacts analyses in the EIR. We note that we have already concluded that the cumulative impacts analyses on noise levels is inadequate on another ground. (See *ante*, at pt. I.B.3.)

8.

Growth-inducing Impacts

Finally, Appellants contend that the EIR failed to adequately analyze the Project's growth-inducing impacts. We disagree.

The DEIR concludes that growth-inducing impacts of the Project would be less than significant because the Project simply would be minimizing obstacles to growth and not causing growth itself.

Appellants contend that the reduction of the cost of aggregate would be a growth-inducing impact. While we agree that lowering the cost of aggregate would reduce one of the barriers to growth, the DEIR could reasonably conclude that there were other barriers to growth, including the zoning of the lands surrounding the Project site. Thus, we conclude that the EIR adequately analyzed growth-inducing impacts.

9.

Whether the Errors in the EIR Were Prejudicial

We have concluded that there were errors with the EIR's analysis of the following issues: (1) adequacy of mitigation measures to address impacts on water; (2) adequacy of mitigation measures with respect to traffic; (3) cumulative impact on noise levels; and, (4) cumulative impacts in general. These errors preclude " 'informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Irritated Residents, supra*, 107 Cal.App.4th at p. 1391.) Thus, the errors were prejudicial.

II.

NON-CEQA ISSUES ON APPEAL

A.

Consistency with General Plan and/or County
Ordinances

Appellants contend that the Project is inconsistent with the Madera County General Plan because the Project exceeds the general plan's noise standard in policy 7.A.2. They also contend that the Project violates Madera County Municipal Code section 18.92.030 because the CUP's approved by the County will cause "a substantial adverse effect upon property values and general desirability of the neighborhood surrounding the Project area." (Italics omitted.)

It is well settled that a county is entitled to considerable deference in the interpretation of its own general plan. (*Sierra Club v. County of Napa*

(2004) 121 Cal.App.4th 1490 [19 Cal.Rptr.3d 1].) Likewise, this deference should apply to the county's interpretation of its own local zoning ordinances.

Here, the DEIR concluded that the Project was consistent with the general plan and the county zoning ordinance, except for significant and unavoidable impacts on air quality and noise. The Board concluded, in its statement of overriding considerations, that the Project should be approved despite these inconsistencies with the general plan. Because the statement of overriding considerations did not properly consider the inconsistency of the Project's cumulative noise impacts, see *ante*, part II.B.3., we conclude that the Project was incorrectly approved.

The Board also found that "the proposed project (request) will not for any reason cause a substantial, adverse effect upon the property values and general desirability of the neighborhood or the County." (Italics omitted.) There is substantial evidence in the record, in the form of a study about the values of neighborhoods near a Colorado quarry, that there would not be a substantial adverse effect upon property values. With respect to the general desirability of a neighborhood, we defer to the County's finding that the general desirability of the neighborhood or of the county will not be adversely impacted because "[t]he project site is a remote large parcel surrounded by similarly large parcels."

## B.

## SMARA

The DEIR contained a reclamation plan, which the FEIR noted was not up to date. The FEIR, in appendix C, contains the current reclamation plan for the Project as required by SMARA. Appellants complain that the DEIR's reclamation plan does not meet the requirements of SMARA because the manner in which affected streambed channels and streambanks will be rehabilitated is not specifically described but instead is deferred to a later time. (See § 2772, subd. (c)(8) [requiring that the reclamation plan provides "[a] description of the manner in which reclamation, adequate for the proposed use or potential uses will be accomplished, including both of the following: [¶] (A) A description of the manner in which contaminants will be controlled, and mining waste will be disposed. [¶] (B) A description of the manner in which affected streambed channels and streambanks will be rehabilitated to a condition minimizing erosion and sedimentation will occur."].) Since this complaint is about the former reclamation plan, we decline to conclude that the current reclamation plan does not satisfy SMARA. Our

brief review of the reclamation plan indicates that Baker has a revegetation plan to minimize erosion.

Appellants also contend that the County violated SMARA by approving the reclamation plan even though it failed to incorporate the classification of mineral lands into its general plan within 12 months of receiving the information from the State Geologist. However, there is substantial evidence that the State Geologist has not classified the Project site into mineral resources zones. Thus, the County did not fail any duty to incorporate mineral land classifications into its General Plan within 12 months of receiving the classification from the State Geologist.

## C.

### Senate Bill No. 610

Finally, Appellants contend that the County violated Water Code sections 10910–10914, otherwise known as Senate Bill No. 610 (2001–2002 Reg. Sess.) (Senate Bill 610) by failing to prepare a water supply assessment for the Project. Senate Bill 610, however, requires a water supply assessment only if a "public water system" is impacted by the Project. A "public water system" is defined to mean "a system for the provision of piped water to the public for human consumption that has 3000 or more service connections." (Wat. Code, § 10912, subd. (c).) Here, the water that will be used for the mine is not part of a public water system. Appellants also contend that the amendment to Mitigation Measure 3.9-1b, which could require the construction of a water system for use by affected neighbors would require a water supply assessment under Senate Bill 610. We agree.

Previously, we concluded that building a new water system is the only effective mitigation measure that was proposed to address the significant adverse impacts on water levels in neighboring private wells. As the California Supreme Court has explained, Senate Bill 610 requires the lead agency to identify likely water sources for a project. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 434 [53 Cal.Rptr.3d 821, 150 P.3d 709].) "An EIR evaluating a planned land use project must assume that all phases of the project will eventually be built and will need water, and must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project. [Citation.]" (*Id.* at p. 431.) Here, the County has failed to analyze the impacts of providing water to the proposed water system. Thus, the County must do a water supply assessment or provide substantial evidence to explain why it did not have to comply with Senate Bill 610.

## DISPOSITION

The judgment is reversed. Costs to appellants.

Wiseman, J., and Levy, J., concurred.