Filed 6/7/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TULARE LAKE CANAL COMPANY,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>STRATFORD PUBLIC UTILITY DISTRICT et al.,<br><br>    Defendants and Respondents;<br><br>SANDRIDGE PARTNERS, L.P., et al.,<br><br>    Real Parties in Interest and Respondents. | F084228<br><br>(Super. Ct. No. 22C-0046)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Valerie R. Chrissakis, Judge.

Herr Pedersen & Berglund, Leonard C. Herr and Ron Statler for Plaintiff and Appellant.

Whitney Thompson & Jeffcoach, Marshall C. Whitney, Kristi D. Marshall; Remy Moose Manley, Tiffany K. Wright, Nathan O. George; McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Real Parties in Interest and Respondents.

No appearance for Defendants and Respondents.

-ooOoo-

Tulare Lake Canal Company (TLCC) filed a petition for writ of mandate alleging Stratford Public Utility District (SPUD) failed to comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) when it granted an easement for a 48-inch water pipeline to Sandridge Partners, L.P. (Sandridge). TLCC applied for a preliminary injunction to halt construction and operation of the pipeline pending CEQA compliance. The trial court applied California's interrelated factors test, determined TLCC was likely to prevail on the CEQA claim, but concluded the relative balance of harms from granting or denying injunctive relief favored denying the injunction. The court stated there was nothing in the record addressing how allowing the project to go forward pending SPUD's CEQA review would cause harm to the public generally. TLCC appealed.

First, based on the appellate record, we conclude it is a near certainty that SPUD failed to comply with CEQA when it granted the easement. The construction and operation of the proposed pipeline qualifies as a discretionary project approved by SPUD, a public entity. As a result, SPUD was required by CEQA to conduct a preliminary review before granting the easement. This strong showing of likely success on the CEQA claims reduces the showing of relative harms needed to obtain the injunction.

Second, we conclude the trial court erred in stating there was no evidence of harm to the public generally in allowing the proposed project to go forward. The public interest in informed decisionmaking about projects with potentially significant environmental effects was harmed when SPUD's board approved the easement without conducting a preliminary review and without obtaining information about the proposed pipeline's construction activity and operational activity. On issues of California law, we conclude (1) harm to the public interest in informed decisionmaking is a type of harm that must be considered in balancing the relative harms of granting or denying a preliminary injunction and (2) it is not necessary for such a harm to be accompanied by a

2.

showing of a likely environmental harm to justify granting a preliminary injunction when the CEQA violation occurs at the initial stage of CEQA review.

Third, we conclude there is a reasonable probability the preliminary injunction would have been granted if the trial court had identified the harm to the public interest in informed decisionmaking and included it in balancing the relative harms.

We therefore reverse the order denying the preliminary injunction and remand the matter for the trial court to reconsider the application of California's interrelated factors test in accordance with the principles set forth in this opinion.

**FACTS**

Sandridge is a limited partnership organized under California law. Sandridge's chief operating officer and farm manager is Craig Andrew. His supervisor is John Vidovich. Persons with more than a 10 percent ownership in Sandridge include John Vidovich, Michael Vidovich, Stephen Vidovich and the Kathryn Tomaino Rev. Trust. Sandridge owns land in Kings County and raises pomegranates, pistachios, raisins, wheat, alfalfa, and cotton. It also leases grazing land to a related joint venture that raises feeder cattle. As part of its operations, Sandridge owns a system of ditches and pipelines that transport water for irrigation. This lawsuit involves an expansion of that system.

Roller Land Company, Inc. (Roller), is a California corporation that owns and farms land in Kings County. Sandridge, Scott Stanton, and John Vidovich each have more than a 10 percent ownership interest in Roller. Sandridge and Roller are collectively referred to as Sandridge.

SPUD, Angiola Water District, and the State of California, Department of Transportation (Caltrans) are the public agencies named as respondents in TLCC's writ petition. SPUD is a self-funded public utilities district formed under Public Utilities Code sections 15501 through 17501. It provides the unincorporated community of Stratford with water, wastewater, and solid waste disposal services.

3.

Angiola Water District is a public entity; its general manager is Mark Grewal. TLCC's claim that Angiola Water District should be subject to a preliminary injunction has been abandoned for purposes of this appeal. Similarly, TLCC is not attempting to make Caltrans subject to a preliminary injunction. Thus, neither Angiola Water District nor Caltrans have filed briefs in this appeal.

TLCC is a mutual water company that operates the Tulare Lake Canal to deliver water to its shareholders. The canal is 60 feet wide and it runs across land owned by Sandridge on a 125-foot-wide right of way. Sandridge owns the parcel on the north side of the canal (APN 026-230-010) and Roller owns the parcel on the south side of the canal (APN 026-230-011). Since November 2017, the president of TLCC's board of directors has been Mark Unruh. Unruh has been employed by J. G. Boswell Company since 2005.

***The Proposed Pipeline***

In the summer of 2021, Sandridge was in the process of constructing a 48-inch water pipeline on its land for irrigation of its crops. Andrew's declaration dated February 24, 2022, described the pipeline project as privately funded with "the primary purpose of moving [Sandridge's] own water from one area of [its] farmland to be used on other portions of [Sandridge's] farmland." The declaration does not identify a secondary or other purpose of the pipeline but stated Sandridge is open to discussing with Angiola Water District its use of the pipeline in the future.

Andrew's supplemental declaration dated March 15, 2022, included aerial maps depicting the locations of Sandridge's groundwater wells and describing how Sandridge's water conveyance system originally worked and how the modified system appeared on the day of the declaration. The maps also showed the location of an easement obtained by Sandridge from SPUD and the location where the pipeline project would cross the Tulare Lake Canal.

The pipeline ends at the Blakely Canal. Andrew testified any water entering the Blakely Canal would be tailwater. The Blakely Canal is owned by Reclamation District

4.

761, an entity in which Sandridge or John Vidovich has an ownership interest. Andrew testified that, to the best of his knowledge, Sandridge or Vidovich did not have any intention or plans for moving water through the pipeline to the Blakely Canal for use elsewhere.

Andrew stated Sandridge's water conveyance system was modified to be more efficient by converting several open ditches to pipeline. After that conversion, expansion of the system began with the installation of the 48-inch pipeline, which is the subject of this litigation. Andrew stated the pipeline would be approximately 12.5 miles long and it would be connected to a 13.5-mile system. Andrew asserted the pipeline project was planned to commence in early January 2022, and the trenching across the Tulare Lake Canal was scheduled for January 26, 2022.

Had the pipeline's construction not been interrupted by litigation, Andrew anticipated it would have been completed with water delivery beginning in the first or second week of March 2022. Andrew asserted that (1) if Sandridge were unable to meet that schedule, they would not have adequate water to irrigate roughly 3,200 acres of wheat and planned cotton south of the Tulare Lake Canal; (2) those properties share water from two wells, but the available water from those wells was not enough to irrigate the wheat (which was already planted) and the planned 1,200 acres of cotton; and (3) without the pipeline, Sandridge would have to fallow up to 1,000 acres or attempt to grow crops that consume less water and are less productive. Andrew estimated the revenue from the planned crop at approximately $800 to $2,000 per acre and, thus, he calculated the losses from one season without the pipeline at approximately $800,000 to $2 million. In describing the potential losses, Andrew's declarations did not address whether the losses could be mitigated by using the groundwater intended for the wheat fields and planned cotton to irrigate other land, either in that growing season or subsequent seasons.

*The Easement Granted by SPUD*

In planning the pipeline, Sandridge determined the most direct route to their lands south of Stratford ran across a strip of land owned by SPUD that was 380 feet wide. Sandridge owned the land to the east and west of that strip. In 2021, Michael Nordstrom, an attorney retained by Sandridge, contacted SPUD to determine if SPUD would sell Sandridge a 20-foot-wide easement along Lincoln Avenue so the pipeline could cross SPUD's land. The engineer representing SPUD, James Blair, stated the discussions with Nordstrom initially centered on what SPUD would ask to grant an easement and where it would be located to minimize any impact to SPUD's parcel.

SPUD and Sandridge had a history of good relations. For example, in 2019, Sandridge gave SPUD rights to install a well on land owned by Sandridge and provided approximately $20,000 to help build it. Based on those good relations and the minimal impact of running the pipeline across SPUD's land, SPUD's board of directors approved gifting an easement to Sandridge on October 6, 2021. The document defining that easement was prepared at Sandridge's expense and, in March 2022, Nordstrom was not sure whether it had been recorded. The minutes from the SPUD board's public meetings of October 6, 2021, and October 13, 2021, along with the agendas for those meetings, make no mention of CEQA or the potential environmental impacts of the pipeline.

The discussions between Sandridge and SPUD also touched on the possibility of another pipeline that would take SPUD's wastewater to a disposal site further away from SPUD's large pond near Stratford. Based on the possibility of a future wastewater disposal or reclamation system, Sandridge intends to install an eight-inch sleeve under the Tulare Lake Canal so that, if such a system is approved in the future, the wastewater pipeline could pass through the sleeve and the cost of excavating or boring under the Tulare Lake Canal a second time could be avoided. The trial court determined that SPUD, while interested in the possibility, had not committed to a wastewater pipeline to the extent that CEQA review of a wastewater pipeline project was warranted.

*Discussions with TLCC*

The route Sandridge planned for the pipeline crossed under Sandridge's property, beneath the subsurface of the Tulare Lake Canal, and onto Roller's parcel. Sandridge planned to place the top of the pipeline four feet below the bottom of the canal. Digging the pipeline's trench across the canal, temporarily damming any minimal residual water in the canal, installing the pipeline and eight-inch sleeve, covering the pipeline and sleeve, and testing for compaction was scheduled to be completed in five days, starting January 26, 2022.

In November 2021, Unruh, the president of TLCC's board, and Carlo Wilcox, a member of Angiola Water District's board, discussed the installation of a water pipeline under the Tulare Lake Canal. Unruh told Wilcox he would investigate TLCC's right of way and see if a common use agreement or other appropriate agreement could be fashioned to address the pipeline's potential impacts on the canal's operation.

On January 12, 2022, Unruh e-mailed Wilcox, informing him TLCC required a common use agreement before it would allow an encroachment of its right of way. The next week, Unruh discovered excavations for the pipeline had begun. Flying over the pipeline's route, Unruh observed it could carry water from a point west of Lemoore to the Blakely Canal. After Unruh expressed his concern the pipeline would interfere with TLCC's easement, Unruh received a letter dated January 17, 2022, on Sandridge letterhead. The letter stated Sandridge was going to install a pipeline under the Tulare Lake Canal, Sandridge owned the property on which the canal's right of way was located, and "we will ensure that the installation will not interfere with the canal or its operation." The letter also advised that Sandridge's pipeline "will be used by Angiola Water District and other associated entities as well," and that Sandridge and the district will hold TLCC harmless from any damages or interference with the use and operation of the canal. The letter was signed by John Vidovich on behalf of Sandridge and Grewal on behalf of Angiola Water District.

*The Trespass Action*

On January 25, 2022, TLCC filed a lawsuit entitled *Tulare Lake Canal Company v. Sandridge Partners et al.*, case No. 22C-0019, in Kings Superior Court (trespass action). In the trespass action, TLCC sought to enjoin Sandridge from constructing the pipeline. TLCC alleged it could not make water deliveries with a trench cut across its canal and, if errors are made in the pipeline's construction, TLCC might not be able to make future water deliveries to its shareholders, which could lead to multiple lawsuits against it. The trespass action centered on the nature of TLCC's easement and the property rights held by TLCC and Sandridge in relation to the Tulare Lake Canal and the land upon which it sits.

On January 26, 2022, TLCC and others came onto the right of way for the Tulare Lake Canal and parked vehicles and large construction machinery on the canal's embankment to prevent the trenching approaching the canal from crossing it. As a result, Sandridge filed a cross-complaint against TLCC in the trespass action.

**PROCEEDINGS**

On February 16, 2022, TLCC filed a verified petition for writ of mandate alleging CEQA violations by SPUD and Angiola Water District. Sandridge and Roller were named as real parties in interest.

On February 24, 2022, TLCC filed a notice of ex parte application for order to show cause staying construction of the project pending compliance with CEQA. The same day, Sandridge filed an opposition to the application. The next day, the hearing on the application was continued to March 4, 2022. Before the hearing, the parties filed additional papers.

At the March 4, 2022, hearing, the trial court granted a temporary restraining order and order to show cause. It also scheduled an evidentiary hearing for March 23, 2022. Subsequently, the court filed an order after hearing and an amended order after hearing

setting forth the terms of the restraining order. On March 18, 2022, the court issued a second amended order after hearing to clarify the terms of the restraining order.

Before the evidentiary hearing, the parties filed additional papers. At the hearing, the trial court confirmed TLCC was not seeking any type of order against Caltrans. After all the evidence and arguments were presented, the court extended the temporary restraining order and took the matter under submission. On April 1, 2022, the court heard additional argument from counsel and announced a portion of its tentative ruling.

On April 4, 2022, the trial court filed orders on the preliminary injunctions sought in this CEQA proceeding and the trespass action. In this case, the court denied TLCC's application for preliminary injunction and dissolved the temporary restraining order contained in the March 18, 2022, second amended order after hearing.

In the trespass action, the trial court granted TLCC a preliminary injunction against Sandridge after determining TLCC was likely to prevail and the balance of relative harms favored issuing the injunction. The injunction was conditioned upon TLCC posting a bond in the amount of $800,000. Sandridge was prohibited from taking any actions toward installing a pipeline under the Tulare Lake Canal that involved trenching through or altering the channel or banks of the canal. Sandridge appealed the issuance of the preliminary injunction in the trespass action. We affirmed the issuance of that preliminary injunction. (*Tulare Lake Canal Company v. Sandridge Partners L.P. et al.* (June 7, 2023, F084439) [nonpub. opn.].)

On April 20, 2022, TLCC appealed the denial of a preliminary injunction in this CEQA proceeding. The next day, TLCC filed a petition for writ of supersedeas with a request for an immediate stay. Among other things, the petition argued there was evidence of irreversible harm to TLCC and the public based on the possibility the pipeline would be used to transport groundwater from wells near Lemoore to the Blakely Canal, where it could be taken out of the county. TLCC argued that because of the lack

of CEQA review, it, the trial court, and the public did not know how much water would be moved, where it would ultimately go, or when it would happen.

On April 29, 2022, this court stayed, effective immediately, the trial court's order dissolving the temporary restraining order. The stay order stated TLCC's petition for writ of supersedeas would be decided after any oppositions to the petition were filed.

On May 20, 2022, this court granted TLCC's petition for writ of supersedeas. As a result, the temporary restraining order contained in the March 18, 2022, second amended order after hearing remains in effect, except as to Angiola Water District.

## DISCUSSION

### I. Preliminary Injunctions and CEQA

#### A. Interrelated Factors Test

Trial courts are authorized by Code of Civil Procedure section 526 to issue injunctions during the litigation. The statute lists seven circumstances when a preliminary injunction may be granted, including (1) when "the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action" (*id*., subd. (a)(2)); (2) when a party is doing or is threatening to do some act in violation of the rights of another party, which act would tend to render the judgment ineffectual (*id*., subd. (a)(3)); or (3) when monetary compensation would be inadequate relief or extremely difficult to ascertain (*id*., subds. (a)(4), (5)).

The general purpose of a preliminary injunction is to preserve the status quo pending a determination on the merits of the action. (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528.) Granting or denying a preliminary injunction is not an adjudication of the ultimate rights in controversy. (*Ibid*.)

10.

### 1. Usual Description of Test

"[A]s a general matter, the question whether a preliminary injunction should be granted involves two interrelated factors: (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief." (*White v. Davis* (2003) 30 Cal.4th 528, 554 (*White*); see *Butt v. State of California* (1992) 4 Cal.4th 668, 677–678.) Typically, the trial court's evaluation of the relative balance of harms compares the interim harm the plaintiff is likely to sustain if the injunction is denied to the harm the defendant is likely to suffer if the preliminary injunction is issued. (*White*, *supra*, at p. 554.) The potential merit and interim harm are described as *interrelated* factors because the greater the plaintiff's showing on one, the less must be shown on the other to obtain an injunction. (*Butt v. State of California*, *supra*, at p. 678.) The goal of this test is to minimize the harm that an erroneous interim decision would cause. (*White*, *supra*, at p. 554; *People v. Uber Technologies*, *Inc.* (2020) 56 Cal.App.5th 266, 284.)

The usual or basic description of the interrelated factors test, which refers to the interim harms *to the parties*, appears in several CEQA decisions. (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 98 ["'interim harm to the respective parties if an injunction is granted or denied'"]; *Drakes Bay Oyster Co. v. California Coastal Com.* (2016) 4 Cal.App.5th 1165, 1172 ["interim harm to plaintiff or defendant if the court denies or grants the preliminary injunction"]; *County of Los Angeles v. Sahag-Mesrob Armenian Christian School* (2010) 188 Cal.App.4th 851, 858 [second factor compares interim harms to plaintiff and defendant]; *Right Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 336, 342 [comparative harms to be suffered by plaintiffs and defendants]; *Miller v. City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1138 [interim harm to plaintiff weighed against interim harm to defendant]; *Friends of Westwood*, *Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 264 [harm to the plaintiff from denial compared to harm defendant would suffer if granted].)

### 2. Role of Harm to Public Interests

In contrast to decisions containing the usual description of the interrelated factors test, some decisions use more general language in describing the balance of harm inquiry—a description that omits the reference to the parties. (E.g., *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 ["balance of harm presented, i.e., the comparative consequences of the issuance and nonissuance of the injunction"]; *Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 856 (*Saltonstall*) [same].) Other decisions set forth both the usual description and the more general language. (E.g., *White*, *supra*, 30 Cal.4th at p. 554.)

A rigid application of the usual description would exclude harm to public interests from the balance of harm inquiry, while the more general language leaves open the possibility that harm to pubic interests are part of that inquiry. Consequently, our order granting TLCC's petition for writ of supersedeas directed the parties' subsequent briefing to "address whether the alleged failure to comply with [CEQA's] disclosure requirements, along with the effects of such failure on the purposes enumerated in California Code of Regulations, title 14, section 15002, subdivision (a), are a harm to the public that must be evaluated when balancing the relative harms of issuing a preliminary injunction." We also directed the parties to explicitly state whether they had located any authority relating to "how, when balancing the relative harms of a preliminary injunction, courts should consider or weigh the harm to the public interest relating to CEQA's disclosure/informational functions (which, for purposes of this analysis, shall be distinguished from CEQA's purpose of preventing adverse environmental effects)."

TLCC's opening brief cited *Saltonstall*, *supra*, 231 Cal.App.4th 837, a case involving the denial of a preliminary injunction to halt the construction of an arena in downtown Sacramento. (*Id*. at pp. 843–844.) The injunction, unlike TLCC's application, was governed by a specific CEQA provision addressing construction of the arena and any attempt to enjoin that construction, namely, Public Resources Code former section

12.

21168.6.6. (Undesignated statutory references are to the Public Resources Code.) Addressing that provision, the Third Appellate District stated:

> "Subdivision (h)(1)(A) of [former] section 21168.6.6 does change the standards for granting injunctive relief in connection with the project. In general, the standard for granting injunctive relief involves balancing competing public interests—the harm if an injunction issues versus the harm if the project is allowed to proceed. '"It is well established that when injunctive relief is sought, consideration of public policy is not only permissible but mandatory."'" (*Saltonstall*, *supra*, 231 Cal.App.4th at p. 854; see *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1471, 1484 [in determining no harm would result from granting plaintiffs' injunctive relief, trial court failed to consider countervailing public policy interest; order granting preliminary injunction vacated].)

Based on the foregoing cases and the fact that CEQA is designed to further public interests, we conclude the balancing of the interim harms likely to result from granting or denying a preliminary injunction in a CEQA proceeding requires the consideration of harms to public interests. In other words, the "relative balance of harms" (*White*, *supra*, 30 Cal.4th at p. 554) encompasses harms to public interests that are likely to result from the issuance or nonissuance of a preliminary injunction.

## B.    CEQA and Public Interests

An evaluation of how public interests would be affected by granting or denying a preliminary injunction in this case requires an identification of the public interests that CEQA seeks to promote. Various legislative findings and declarations of intent are set forth in CEQA's first chapter, sections 21000 through 21006. For instance, section 21002 states "the procedures required by [CEQA] are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." The regulations that implement CEQA and are set forth in California Code of Regulations, title 14, section 15000 et seq. are referred to as "Guidelines." Guidelines section 15002, subdivision (a) states:

13.

"The basic purposes of CEQA are to:

"(1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities.

"(2) Identify ways that environmental damage can be avoided or significantly reduced.

"(3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible.

"(4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved." (See *Union of Medical Marijuana Patients*, *Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184–1185 (*Union*).)

In *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, this court summarized these purposes in stating that "[p]olitical accountability, informed self-government and environmental protection are promoted by the information and disclosure functions of CEQA." (*Id*. at p. 715, fn. 23.)  The importance of the agency's obtaining and disclosing information is reflected in CEQA's provisions defining a prejudicial abuse of discretion.  Section 21005 provides:

"(a) The Legislature finds and declares that it is the policy of the state that *noncompliance with the information disclosure provisions* of [CEQA] which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of this division, may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.

"(b) It is the intent of the Legislature that, in undertaking judicial review pursuant to Sections 21168 and 21168.5, courts shall continue to follow the established principle that there is no presumption that error is prejudicial."

"This court has previously explained, '[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and

14.

informed public participation, thereby thwarting the statutory goals of the EIR process.'" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391; see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)  Under the foregoing definition of prejudice, noncompliance with CEQA's information disclosure requirements is not per se reversible.  (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1109.)

### C.    Stages of CEQA Review

With CEQA's basic purposes in mind, we next describe the stages of CEQA review to provide context for how CEQA's purposes were negatively impacted by the public agency's conduct in this case.  (See *King & Gardiner Farms*, *LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 885 [three stages of CEQA review]; Guidelines, § 15002, subd. (k) [CEQA's three-step process].)[1]

In the first stage, the public agency conducts a preliminary review and determines whether the proposed activity is a discretionary "project" for purposes of CEQA. (*Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 363 (*L Street*); § 21080, subd. (a) [CEQA "shall apply to discretionary projects … approved by public agencies"]; see Guidelines, § 15060 [preliminary review].)  If the activity is a CEQA project, the agency determines whether the project is exempt from CEQA.  (*L Street*, at p. 363; see Guidelines, § 15061 [review for exemption].)  When the

---

[1]The sequential inquiries or multiple step decision tree for implementing CEQA has been divided in different ways.  For instance, the California Supreme Court has stated the decision tree has been characterized as having three tiers—(1) CEQA applicability, (2) exemption from environmental review, and (3) environmental review.  (*Union*, *supra*, 7 Cal.5th at pp. 1185–1187; see *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380.)  In comparison, the Guidelines' approach recognizes three steps correlated to the document produced at the end of that step.  (Guidelines, § 15002, subd. (k).)  Thus, the first step in the Guidelines encompasses the Supreme Court's first two tiers.  The Supreme Court's third tier encompasses the Guidelines' second and third steps—an initial study that results in the adoption of a negative declaration or leads to the third step and the preparation of an environmental impact report (EIR).  Our use of the Guidelines' description does not affect the resolution of the legal issues presented in this appeal.

activity is not a discretionary project or when the project is exempt, the agency may, but is not required to, file a notice of exemption and its CEQA review ends. (Guidelines, §§ 15002, subd. (k)(1), 15062 [notice of exemption].) When an agency chooses to file a notice of exemption, it must cite "the relevant statute or section of the CEQA Guidelines and includ[e] a brief statement of reasons to support the finding of exemption [citation]." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 380; *Union*, *supra*, 7 Cal.5th at p. 1186.) A shorter statute of limitations applies to such a filing. (See § 21167, subd. (d); Guidelines, § 15062, subd. (d) [filing a notice of exemption starts a 35-day limitations period; otherwise, a 180-day statute of limitations applies].)

If the second stage of CEQA review is reached, the public agency must "conduct an initial study to determine if the project may have a significant effect on the environment." (Guidelines, § 15063, subd. (a).) In making this determination, the agency applies the fair argument standard and asks whether substantial evidence supports a fair argument that the proposed project may have a significant adverse effect on the environment. (*L Street*, *supra*, 229 Cal.App.4th at p. 364. [fair argument standard is a low threshold].) If the initial study shows the fair argument standard is not met, the agency prepares a negative declaration. (Guidelines, § 15002, subd. (k)(2); see Guidelines, §§ 15070–15075 [negative declaration process].)

The third stage of CEQA review is reached if the initial study shows the fair argument standard is met. (Guidelines, § 15002, subd. (k)(3).) The third stage involves a full-scale environmental review and the preparation of an EIR before the agency may approve the project. (*Ibid*.; see Guidelines, §§ 15080-15097 [EIR process].)

The information and related disclosures needed to successfully complete each stage of CEQA review increases at every stage. A fundamental part of complying with the requirements imposed at each stage of CEQA review is an accurate description of the proposed activities—that is, the project. For example, during the third stage of CEQA

review, "every EIR must set forth a project description that is sufficient to allow an adequate evaluation and review of the environmental impact." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 654.) An "accurate, stable[,] and finite" project description is essential to an informative and legally sufficient EIR. (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193.) "A curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal … and weigh other alternatives in the balance." (*Id*. at pp. 192–193.) Thus, an agency's failure to provide an accurate, stable, and finite project description is a failure to proceed in a manner required by law. (*Id*. at p. 200.)

Similarly, during the second stage of CEQA review, "[t]he initial study must include a description of the project." (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 406.) "An accurate and complete project description is necessary for an intelligent evaluation of the potential environmental impacts of the agency's action." (*Ibid*.) "[T]he environmental review conducted for the initial study must include the entire project." (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1222.) When an agency fails to provide an accurate project description, the environmental review process is tainted by that informational defect and the adoption of a negative declaration in those circumstances is inappropriate. (*Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 267 (*Nelson*) [adoption of negative declaration set aside].)

In *Nelson*, this court stated that "a correct determination of the nature and scope of the project is a critical step in complying with the mandates of CEQA." (*Nelson*, *supra*, 190 Cal.App.4th at p. 267.) Although *Nelson* involved an initial study and the adoption of a mitigated negative declaration, we conclude this general principle and the rationale

behind it applies with equal force during the first stage of CEQA review when the public agency determines if the proposed activity is a discretionary project subject to CEQA and, if so, whether it is exempt.

### D.    Standard of Review

Appellate review of a trial court's order granting or denying a motion for preliminary injunction generally is "limited to whether the trial court's decision was an abuse of discretion." (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 678.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; accord, *County of Kern v. T.C.E.F.*, *Inc.* (2016) 246 Cal.App.4th 301, 316.) The sufficiency of the evidence for the trial court's express and implied findings of fact are reviewed under the deferential substantial evidence standard. (*Haraguchi*, at p. 711; *T.C.E.F.*, at p. 316; *Yu v. University of La Verne* (2011) 196 Cal.App.4th 779, 787.) The trial court's resolution of a question of law is subject to de novo review. (*Haraguchi*, at p. 712; *T.C.E.F.*, at p. 316.) Thus, "when the likelihood of prevailing on the merits depends on a question of law, an appellate court independently decides that question of law and, thus, whether there was a possibility of the moving party succeeding on the merits." (*T.C.E.F.*, *supra*, at p. 317.) When the challenged determination involves the trial court's weighing of the interrelated factors described below, the result of that weighing process generally will be upheld on appeal so long as the trial court did not exceed the bounds of reason or contravene the court's express and implied factual findings. (*Id.* at p. 316.)

The party challenging the trial court's order to grant or deny a preliminary injunction has the burden of making a clear showing of such an abuse of discretion. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69; *County of Kern v. T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 316.) An order *denying* an application for a preliminary injunction

should be affirmed if the trial court correctly found the moving party failed to establish either of the interrelated factors. (*Yu v. University of La Verne*, *supra*, 196 Cal.App.4th at p. 787.) Where, as in this case, the trial court relied on only one factor to deny the preliminary injunction, "the reviewing court must determine whether that reliance conclusively supports the trial court's determination regardless of the remaining considerations." (*King v. Meese* (1987) 43 Cal.3d 1217, 1227–1228.)

## II.     Likelihood of Prevailing

### A.     Trial Court's Decision

The trial court determined SPUD's granting of an easement to Sandridge qualifies as a "discretionary project" for purposes of CEQA review. (§ 21080, subd. (a) [CEQA "shall apply to discretionary projects … approved by public agencies"].) It also determined the exhaustion of administrative remedies requirement set forth in section 21177 did not bar TLCC from raising a CEQA violation in a writ petition. The court concluded the decision whether the proposed project is exempt from CEQA needed to be made by SPUD in the first instance. This conclusion was based on the absence of any evidence that SPUD conducted a preliminary review before approving the easement or that SPUD actually considered whether the pipeline project was exempt from CEQA. Consequently, the court concluded "that there exists one or more grounds upon which [TLCC] is likely to prevail in this case."

Sandridge has not presented coherent arguments in its appellate brief attacking the trial court's determination that TLCC was likely to prevail on a CEQA claim. Instead, Sandridge presents arguments suggesting any CEQA violation was trivial and, moreover, would not cause any irreparable harm.

Here, we analyze the likelihood of TLCC prevailing on a CEQA claim because as that probability increases, the potential for harm to Sandridge decreases. (See *Butt v. State of California*, *supra*, 4 Cal.4th at p. 678.) In other words, the more likely a

prejudicial CEQA violation occurred, the less likely the harms claimed by Sandridge would be attributed to an erroneous issuing of an injunction and the more likely the harm would be attributed to the failure of SPUD and Sandridge to comply with the law. This latter type of harm is sometimes referred to as self-inflicted. (See *United States v. Superior Court* (1941) 19 Cal.2d 189, 197 [self-inflicted injury could not be used to show irreparable injury].)

Stated in broad terms, we consider the likelihood TLCC will obtain a writ of mandate directing SPUD to vacate its approval of the easement and not reapprove it without complying with CEQA. At a minimum, complying with CEQA would require SPUD to conduct a preliminary review to "determine whether the proposed activity is subject to CEQA" and, if so, "decide whether the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review." (*Union*, *supra*, 7 Cal.5th at p. 1185; see Guidelines, §§ 15060, 15061.)

## B.     The Proposed Pipeline Is a CEQA Project

Generally, CEQA "shall apply to discretionary projects proposed to be carried out or approved by public agencies …." (§ 21080, subd. (a).) Consequently, determining whether a proposed activity is subject to CEQA requires determining whether the proposed activity is a "project" that involves a discretionary approval. CEQA broadly defines a "[p]roject" to include "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and [¶] … [¶] involves the issuance to a person of [an] entitlement for use by one or more public agencies." (§ 21065, subd. (c).) The statutory definition of "project" is augmented by the Guidelines, which define a "project" as "*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment …." (Guidelines, § 15378, subd. (a), italics added.)

20.

### 1. *Issuance of Entitlement*

First, we consider whether SPUD's grant of an easement to Sandridge is an "issuance to a person of [an] entitlement for use" by a public agency. (§ 21065, subd. (c); Guidelines, § 15378, subd. (a)(3).) As a limited partnership, Sandridge meets the statutory definition of a "person." (§ 21066.) As a public utility district, SPUD qualifies as a public agency—more specifically, a local agency. (See § 21063 [public agency includes any public district]; Guidelines, §§ 15379 [public agency], 15368 [local agency includes districts and special districts].)

In addition, the easement granted is an "entitlement for use" as that phrase is used in CEQA's definition of "project." (§ 21065, subd. (c); Guidelines, § 15378, subd. (a)(3).) Entitlement ordinarily means the "[r]ight to benefits, income or property which may not be abridged without due process." (Black's Law Dict. (6th ed. 1990) p. 532.) An easement is "[a] right of use over the property of another." (*Id.* at p. 509; see Civ. Code, § 801 [right of way is a servitude upon land called an easement].) California courts have described an easement as a nonpossessory interest in land of another that gives the easement owner the right to use the land. (*Kazi v. State Farm Fire & Casualty Co.* (2001) 24 Cal.4th 871, 880; see Civ. Code, §§ 803 [dominant and servient tenements], 806 [terms of the grant determine the extent of a servitude].)

Based on the plain meaning of CEQA's text and the characteristics of an easement, we conclude as a matter of law that SPUD's grant of the easement was an "issuance to" Sandridge of an "entitlement for use" of SPUD's property. (§ 21065, subd. (c); Guidelines, § 15378, subd. (a)(3).) Alternatively, the gift of the easement qualifies as a "form[] of assistance from" a public agency that supports, in part, the proposed pipeline. (§ 21065, subd. (b); Guidelines, § 15378, subd. (a)(2).) Consequently, that aspect of the definition of a CEQA project has been established by the undisputed facts in the record.

## 2. *Exercise of Discretionary Power*

Second, we consider whether the proposed pipeline "involve[s] the exercise of discretionary powers by a public agency." (Guidelines, § 15060, subd. (c)(1).) If no discretion was exercised by SPUD in approving the grant of the easement, SPUD's approval will not cause the pipeline project to be subject to CEQA. (See § 21080, subd. (a); Guidelines, § 15002, subd. (i) [discretionary and ministerial projects].)

A project is regarded as discretionary if it "requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, regulations, or other fixed standards." (Guidelines, § 15357; see *id.*, § 15002, subd. (i).) In comparison, a decision is classified as ministerial, rather than discretionary, when it involves "little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or judgment in reaching a decision." (Guidelines, § 15369.) Stated another way, "[w]here the law requires a governmental agency to act on a project in a set way without allowing the agency to use its own judgment, the project is called 'ministerial,' and CEQA does not apply." (Guidelines, § 15002, subd. (i)(1).) Thus, an agency's approval is ministerial "[o]nly when a private party can legally compel approval without any changes in the design of its project which might alleviate adverse environmental consequences." (*Friends of Westwood, Inc. v. City of Los Angeles*, *supra*, 191 Cal.App.3d at p. 267, italics omitted.)

Here, the minutes from the meetings of SPUD's board of directors show the members exercised their personal judgment as to the wisdom of granting Sandridge the easement, rather than simply determining Sandridge's request conformed to a fixed standard that required them to approve the grant. Blair reported to the board that he did not believe granting the easement would interfere with a monitoring well and legal

22.

counsel stated SPUD would retain ownership.  This information was relevant to an exercise of the board's judgment, not its application of a fixed standard that would entitle Sandridge to the easement.  Furthermore, nothing in the declarations of Nordstrom and Blair about their discussions that led to SPUD's grant of the easement to Sandridge suggests Sandridge was entitled to the easement under a fixed standard.  As described by Blair, those discussions "initially centered on what SPUD would ask to grant such an easement and where it could be located to cause little to no impact to [SPUD's] parcel." The board's authority to grant the easement by gift is set forth in Public Utilities Code section 16431, which provides that a district may dispose of real property "of every kind within or without the district, when in the judgment of the board it is for the best interests of the district so to do."  Consequently, based on the appellate record, we conclude as a matter of law that the board's approval of the easement "involve[d] the exercise of discretionary powers by a public agency."  (Guidelines, § 15060, subd. (c)(1).)

### 3. *Scope of the Activity Constituting the Project*

For a CEQA "project" to exist, there must be, among other things, "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment."  (§ 21065.)  The term "activity" refers to "the whole of an action."  (Guidelines, § 15378, subd. (a).)  The Guidelines state the "phases of the project" include "planning, construction, and operation."  (Guidelines, § 15161; see *id.*, § 15126.2, subd. (b).)  In addition, instructions in Appendix G (checklist) of the Guidelines state:

> "All [checklist] answers must take account of the whole action involved, including off-site as well as on-site, cumulative as well as project-level, indirect as well as direct, and construction as well as operational impacts."

Thus, we conclude the "activity" (i.e., the whole of the action) constituting the "project" (§ 21065) includes both the construction and operation of the proposed

pipeline. Stated another way, the "project" is not limited to SPUD's grant of the easement and Sandridge's construction of 380 feet of pipeline across that easement.

### 4. *Physical Change in the Environment*

Next, we consider whether the construction and operation of the pipeline "may cause … a direct physical change in the environment." (§ 21065; see Guidelines, § 15378, subd. (a).) "'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.) "Examples of *direct* physical changes in the environment are the dust, noise, and traffic of heavy equipment that would result from *construction* of a sewage treatment plant and possible odors from *operation* of the plant." (Guidelines, § 15064, subd. (d)(1), italics added.)

Applying these principles, we conclude the proposed pipeline activity would cause a direct physical change in the environment because, among other things, (1) the equipment used during construction will generate noise and dust and (2) the operation of the pipeline would transfer groundwater from one area for use in another area. Both the removal of groundwater—a part of the environment—from wells and its use in agricultural irrigation change the physical conditions at the well's location and the location where the water is used. Consequently, in conducting a preliminary review in accordance with Guidelines section 15060, SPUD could not determine "[t]he activity will not result in a direct or reasonably foreseeable indirect physical change in the environment." (Guidelines, § 15060, subd. (c)(2).)

### 5. *Summary*

At a minimum, "the whole of [the] action" (Guidelines, § 15378, subd. (a)) includes the construction and operation of the proposed pipeline, which is a discretionary project subject to CEQA. First, that "activity" will cause "a direct physical change in the environment" for purpose of section 21065. (See Guidelines, § 15378, subd. (a).)

Second, the construction and operation of the proposed pipeline "involves the issuance to [Sandridge] [of an] entitlement for use by one or more public agencies"—namely, SPUD. (§ 21065, subd. (c); Guidelines, § 15378, subd. (a)(3).) Third, SPUD's issuance of an entitlement in the form of an easement is a discretionary approval of the proposed project. Thus, the proposed pipeline constitutes a "discretionary project[] … approved by [a] public agenc[y]" for purposes of section 21080, subdivision (a). Consequently, based on the record before us, SPUD should have conducted a preliminary review in which it reached the conclusion that the proposed pipeline "is subject to CEQA." (Guidelines, § 15060, subd. (c).)

As a result, compliance with CEQA also required SPUD to address the next issue and "determine whether the project is exempt from CEQA." (Guidelines, § 15061, subd. (a).) Resolution of this issue involves the consideration of statutory exemptions found in section 21080, subdivision (b) and the categorical exemptions found in Guideline sections 15300 through 15333. (See *Union*, *supra*, 7 Cal.5th at p. 1186.) Because SPUD did not conduct a preliminary review, did not obtain information about the whole of the activity constituting the proposed project, and did not determine the proposed project was exempt from CEQA, it is a near certainty that SPUD failed to comply with CEQA, and TLCC will obtain a writ of mandate directing SPUD to take corrective action.

## III. Relative Balance of Harms

### A. Trial Court's Decision

After concluding TLCC was likely to prevail, the trial court examined "whether and to what extent the parties will sustain harm if a preliminary injunction issues." The court stated Sandridge had provided specific information about the potential harms it claimed a preliminary injunction would cause to its farming operations. The court also stated "there is nothing within the record which specifically addresses how allowing the Pipeline Project to go forward pending SPUD's review of the same, will cause TLCC

and/or the public generally to suffer harm or result in an inability of [SPUD] to consider the project or implement particular mitigation measures or alternatives." Consequently, the court denied the preliminary injunction and dissolved the temporary restraining order based on its weighing of the relative harms. The court concluded "it appears that TLCC is unlikely to suffer greater injury from the court's denial of the injunction than that to be suffered by [Sandridge and Roller] should the court continue to restrict their development and utilization of the irrigation pipeline pending [SPUD's] CEQA-related review of the same."

## B.    Harm to the Public Interest

Here we consider whether the trial court erred in stating there was nothing in the record addressing how allowing the project to go forward pending SPUD's CEQA review would cause the public generally to suffer harm. That statement was erroneous. In addition, Sandridge misinterprets the trial court's statement when they argue SPUD's failure to comply with CEQA's disclosure requirements was considered by the trial court when it balanced the relative harms.

### 1.    *Disclosure of Information about the Project*

The record establishes SPUD issued an entitlement in support of an activity that meets CEQA's definition of a discretionary project without conducting a preliminary review and without determining whether the pipeline project was exempt from CEQA. Furthermore, nothing in the record shows SPUD's board obtained information about the scope of the activity constituting the project. In part I.C of this opinion, we discussed how an accurate description of the activity constituting the project is essential at each stage of the CEQA review process. (*Nelson*, *supra*, 190 Cal.App.4th at p. 267 ["a correct determination of the nature and scope of the project is a critical step in complying with the mandates of CEQA"].)

In this case, the lack of information about the proposed pipeline's construction activity and operational activity meant SPUD's board approved the easement without being "[i]nform[ed] … about the potential, significant environmental effects of proposed activities." (Guidelines, § 15002, subd. (a)(1) [CEQA's basic purposes].) Consequently, the record establishes the public interest in a public agency making an informed decision was harmed.

Sandridge attempts to undercut this public harm by arguing "CEQA imposes no duty on Sandridge, as a private landowner, to 'disclose' information about its activities that do not require government approval." They support the argument by quoting Guidelines section 15002, subdivision (c), which states: "Private action is not subject to CEQA unless the action involves governmental participation, financing, or approval." We conclude Sandridge's argument, while containing a correct statement of law, is off point because Sandridge sought an approval from a governmental agency when it asked SPUD for an easement. As explained next, that request for an easement triggered SPUD's duty to obtain information and Sandridge's obligation to provide information.

Sandridge's obligation to submit information required for an evaluation of the proposed project is addressed in section 21160, which states:

> "(a) Whenever any person applies to any public agency for a lease, permit, license, certificate, or other entitlement for use, the public agency may require that person to submit data and information that may be necessary to enable the public agency to determine whether the proposed project may have a significant effect on the environment or to prepare an environmental impact report."

More specifically, Guidelines section 15060 addresses the submission of information during a preliminary review. When reviewing an application for a permit or other entitlement for use, an agency "should be alert for environmental issues that might require preparation of an EIR or that might require *additional explanation by the applicant*." (Guidelines, § 15060, subd. (a), italics added.) Under this Guideline, lead

27.

agencies have the authority "to require the applicant to submit additional information needed for environmental evaluation of the project." (*Ibid*.) In effect, CEQA requires a private person to disclose information about a proposed activity if that person "applies to any public agency for a … permit … or other entitlement for use" (§ 21160, subd. (a)) because an agency needs an accurate and complete description of the activity before it can comply with CEQA and approve the entitlement. Thus, CEQA does not allow a private person to keep information about the activity secret when that person wants an agency's approval. However, where part of that information is a trade secret, it is protected from public disclosure by section 21160, subdivision (b).

Consequently, Sandridge's argument about disclosures by private persons fails to show CEQA's informational requirements were satisfied in this case, and thus, fails to show the public interest in compliance with those requirements was not harmed. Similarly, Sandridge's argument that SPUD might determine the pipeline project is exempt from CEQA fails to demonstrate a lack of public harm from the failure to comply with CEQA because an exemption determination could not be reached without an accurate and complete project description. Accordingly, we conclude SPUD's failure to conduct a preliminary review and its failure to obtain the information essential to that review harmed the public interest in informed decisionmaking.

### 2. *Informational Harm Is a Relevant Relative Harm*

Next, we consider the role of the harm to the public interest in informed decisionmaking when evaluating the "relative balance of harms" (*White*, *supra*, 30 Cal.4th at p. 554) likely to result from the erroneous issuance or nonissuance of a preliminary injunction. Our order granting TLCC's petition for writ of supersedeas identified this issue and directed the parties to address it in their appellate briefs.

TLCC describes the failure to comply with CEQA's informational requirements as a "procedural harm" to be considered in the balancing of harms on application for

preliminary injunction and contends that when coupled with environmental harm, courts have determined irreparable harm has been sufficiently shown. Noting TLCC's description of a failure to comply with CEQA's informational requirements as a "procedural harm,"[2] Sandridge argues the so-called procedural harm *must* be coupled with environmental harm to satisfy the irreparable harm component for issuing a preliminary injunction. Sandridge contends this proposed rule of law is consistent with CEQA and makes perfect sense because the contrary rule would eviscerate the irreparable harm requirement and allow preliminary injunctions in every CEQA case simply by alleging failures to disclose. In addition, Sandridge asserts TLCC did not satisfy the proposed rule of law because TLCC presented no evidence of any environmental harm, much less evidence of an irreparable environmental harm to the public.

A foundational issue underlying the parties' contentions is whether harm to the public interests in informed decisionmaking and in public disclosure should be considered at all in evaluating the relative balance of harms from granting or denying a preliminary injunction. We conclude these public interests are the types of public interests that must be considered in evaluating the relative balance of harms from granting or denying a preliminary injunction. (See pt. I.B., *ante*.) This legal conclusion is consistent with CEQA's basic purposes and is not seriously disputed by the parties. (See generally *Laurel Heights Improvement Assn. v. Regents of University of California*

---

[2]TLCC's use of "procedural" in this context has a narrower meaning than the California Supreme Court's use of the word in the statement that its "decisions have thus articulated a procedural issues/factual issues dichotomy." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.) This identification of two types of CEQA error is derived from section 21168.5, which states an agency abuses its discretion under CEQA if it "has not proceeded in a manner required by law" or its "decision is not supported by substantial evidence." Whether an agency has committed "procedural" error—that is, has not proceeded in a manner required by law—is subject to de novo review, while whether the agency has made factual errors is subject to review under the substantial evidence standard. (*Sierra Club*, at p. 512.) Under the Supreme Court's use of the term, the "procedural" error of failing to adopt a feasible mitigation measure would cause an environmental harm.

(1988) 47 Cal.3d 376, 392 (*Laurel Heights*) ["If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees"].)  This conclusion leads to our discussion of the issues of California law raised by the parties' contentions.

The parties have cited, and we have located, no published California decision explicitly identifying and resolving the following legal issue:  In a CEQA case, must harm to the public interests in informed decisionmaking and public disclosure be accompanied by a showing of an environmental harm before a preliminary injunction may be issued based solely on harms to the public?  Stated another way, is the harm from noncompliance with CEQA's information disclosure provisions insufficient to justify granting a preliminary injunction.

As background, we note TLCC's use of the term "procedural harm" is taken from federal decisions addressing the issuance of a preliminary injunction in cases brought under the National Environmental Protection Act (NEPA; 42 U.S.C. § 4331 et seq.)  One reason the federal decisions use the term is that "NEPA imposes only *procedural* requirements to 'ensur[e] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'"  (*Winter v. Natural Resources Defense Council, Inc.* (2008) 555 U.S. 7, 23, italics added (*Winter*).)

Cases using the term "procedural harm" include *Save Strawberry Canyon v. Department of Energy* (N.D.Cal. 2009) 613 F.Supp.2d 1177, where the plaintiff sought a preliminary injunction based on NEPA violations and claimed "both irreversible *procedural* harm as well as harm to the environment."  (*Save Strawberry*, at p. 1187.)  Under the facts of that case, the district court concluded there was "no doubt that the alleged breach of NEPA constitutes procedural injury.  [¶] It is also quite possible that plaintiff will suffer environmental injury."  (*Id*. at p. 1189.)  The court granted the

30.

preliminary injunction.  (*Id*. at p. 1191.)  Another federal decision distinguishing procedural harm from environmental harm is *Sierra Club v. U.S. Army Corps of Engineers* (8th Cir. 2011) 645 F.3d 978, where the court stated the "record discloses both procedural and concrete, substantive environmental harms."  (*Id*. at p. 995; see *Fund for Animals v. Norton* (D.D.C. 2003) 281 F.Supp.2d 209, 222 [when combined with irreparable aesthetic injuries, procedural harm arising from a NEPA violation bolstered plaintiffs' claim for a preliminary injunction].)

One way to resolve the issue presented would be to adopt a presumption that violation of CEQA's information disclosure provisions causes irreparable harm or is likely to cause environmental harm.  Such an approach is suggested by some older NEPA cases involving preliminary injunctions that refer to a presumption of harm or damage.  For example, the Ninth Circuit Court of Appeals stated:  "Irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action."  (*Save Our Ecosystems v. Clark* (9th Cir. 1984) 747 F.2d 1240, 1250.)  The Tenth Circuit stated that "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure."  (*Davis v. Mineta* (10th Cir. 2002) 302 F.3d 1104, 1115.)

In *Monsanto Co. v. Geertson Seed Farms* (2010) 561 U.S. 139, the United States Supreme Court quoted Ninth Circuit decisions that "appear[ed] to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances. No such thumb on the scales is warranted."  (*Id*. at p. 157.)  The United States Supreme Court also concluded the proper approach for determining whether to issue an injunction in a NEPA case is to apply the traditional four-factor test.  (*Id*. at p. 158.)  Under that test, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

31.

injunction is in the public interest." (*Winter*, *supra*, 555 U.S. at p. 20 [injunction restricting sonar use during Navy's training exercises vacated].)

Based on the federal case law, we consider whether, as a matter of California law, to adopt a judicially created presumption that a violation of CEQA constitutes sufficient public harm to warrant the issuance of preliminary injunctions, except in unusual cases. Typically, courts create presumptions when warranted by fairness or public policy. (See 2 McCormick on Evidence (8th ed. 2020) § 343, p. 730.) We conclude a judicially created presumption is not appropriate. Such a presumption is not compatible with the Legislature's approach to whether a failure to comply with CEQA is prejudicial error requiring reversal of an agency's decision. The Legislature determined "that noncompliance with the information disclosure provisions of [CEQA] which precludes relevant information from being presented to the public agency … *may* constitute a prejudicial abuse of discretion." (§ 21005, subd. (a); see § 15 ["'may' is permissive"].) Because a violation of CEQA's information disclosure provisions is not necessarily prejudicial error, it is logical to conclude such a violation does not necessarily cause enough harm to the public interest to automatically justify a preliminary injunction. Like the determination of prejudice, a further evaluation is necessary to determine the particular effects of the noncompliance on the CEQA review process. Once those effects are identified, they must be included in the "relative balance of harms." (*White*, *supra*, 30 Cal.4th at p. 554.)

Another reason a presumption is inappropriate is that CEQA applies to a broad range of activities, and alleged CEQA violations can occur at many points in the CEQA review process. This combination of factors produces a wide array of CEQA cases where an injunction could be sought. This variety is best dealt with using the interrelated factors test, which is flexible. Adopting a presumption of harm would reduce that flexibility and perhaps produce results that are contrary to the balance of competing interests struck by the Legislature in enacting and amending CEQA. Therefore, like the

32.

United States Supreme Court's determination under NEPA, we conclude that, in CEQA cases, the balancing of harms required by California's interrelated factors test should be done on a case-by-case basis without the use of a presumption.

Similarly, we conclude it is inappropriate to adopt a hard-and-fast rule that harm to the public from a failure to comply with CEQA's information disclosure provisions must be accompanied by a showing of a likely environmental harm before a preliminary injunction may be issued. (Cf. *Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 315 ["no hard-and-fast rule that a party's discontinuance of illegal behavior makes injunctive relief against him or her unavailable"].) More specifically, we conclude a hard-and-fast rule requiring a showing of likely environmental harm is inappropriate when the failure to comply with CEQA involves the absence of (1) a preliminary review and (2) an accurate and complete description of the whole of the action constituting the discretionary project.

The reason the hard-and-fast rule proposed by Sandridge should not be applied at the initial stage of CEQA review is that it is difficult to evaluate the potential adverse environmental impacts without an accurate and complete description of the activity constituting the project. For instance, an agency cannot perform a meaningful evaluation of whether "[t]he activity will not result in a direct or reasonably foreseeable indirect physical change in the environment" and reach a decision if it does not know the full extent of the activity. (Guidelines, § 15060, subd. (c)(2).) Consequently, rigidly requiring a CEQA plaintiff to establish an adverse environmental impact at such an early point in the CEQA review process would benefit project proponents who withhold information in violation of CEQA and hinder a public agency's ability to evaluate the activity's environmental impact.

TLCC's opening brief makes this point by asking a series of questions about the operation of the proposed pipeline, including (1) how many wells will supply groundwater to the pipeline, (2) how much total groundwater will be supplied, (3) how

33.

much from each well, (4) will surface water be transported, (5) by whom and where will the water ultimately be used. Noting the proposed pipeline is 48 inches in diameter, TLCC argues it is laughable to suggest such a large pipeline is needed to transport water from wells near Lemoore to the Sandridge's fields between TLCC's canal and the Blakely Canal.

A rule of law prohibiting preliminary injunctions in cases where a showing of environmental harm cannot be made because details about the proposed activity have not been disclosed would incentivize project proponents to withhold information and complete construction before the environmental consequences can be evaluated. Such an incentive would be contrary to our Supreme Court's CEQA decisions, which have repeatedly recognized "that postponing environmental analysis can permit 'bureaucratic and financial momentum' to build irresistibly behind a proposed project, 'thus providing a strong incentive to ignore environmental concerns.'" (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 135, quoting *Laurel Heights*, *supra*, 47 Cal.3d at p. 395.)

### 3. Summary

First, we determined the trial court erred in stating there was no evidence of harm to the public by allowing the project to go forward. The record establishes that the public interest in SPUD, a public agency, making an informed decision was harmed. (See (Guidelines, § 15002, subd. (a)(1).) Second, we concluded this type of harm to the public interest must be considered when evaluating the relative balance of harms that is likely to result from a decision to grant or deny a preliminary injunction. Third, we declined to create a presumption that violation of CEQA's information disclosure provisions causes irreparable harm or is likely to cause environmental harm. Fourth, we rejected a proposed rule of law that the noncompliance with CEQA's information disclosure requirement *must* be coupled with environmental harm to establish a harm sufficient for

34.

issuing a preliminary injunction. Instead, we concluded the balancing of harm must be completed under the general principles that define California's traditional interrelated factors test.

Based on the foregoing conclusions, we next consider whether the trial court's error was prejudicial and, if so, the appropriate appellate relief. (See Code Civ. Proc., §§ 43, 906 [powers of reviewing court].)

## C. Prejudice and Appellate Relief

To obtain relief on appeal, an appellant has the burden of affirmatively demonstrating prejudicial error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; see Cal. Const., art. VI, § 13.) In civil cases, the test for prejudice is whether there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Applying this test, we consider whether there is a reasonable probability that TLCC would have obtained a preliminary injunction in the absence of the error. We conclude a reasonable probability exists.

The assessment of whether TLCC has a reasonable probability of obtaining a preliminary injunction depends on the relative balance of harms of an erroneous grant or denial of the preliminary injunction. (*White*, *supra*, 30 Cal.4th at p. 554.) The greater TLCC's likelihood of prevailing on its CEQA claim, the lesser the showing needed on the relative balance of harms likely to result from granting or denying the injunction.

In part II.B.5., *ante*, we concluded it is nearly certain SPUD failed to comply with CEQA and, as a result, TLCC will obtain a writ of mandate directing SPUD to take corrective action. Thus, it is unlikely a grant of a preliminary injunction would be erroneous, which affects the balancing of harms. (See *Butt v. State of California*, *supra*, 4 Cal.4th at p. 678.) Stated another way, it is unlikely the harms claimed by Sandridge will be caused by the issuance of an injunction and, instead, the harms from the delay in

completing the pipeline project would be attributed to the failure to comply with CEQA—a harm that can be regarded as self-inflicted.

Other factors affecting the relative balance of harm include, without limitation, (1) the likelihood the economic damages claimed by Sandridge could be remedied by an award of damages, which would be secured by the posting of a bond (Code Civ. Proc., § 529); (2) the practical effect of the existence of an injunction in the trespass action;[3] and (3) the bureaucratic and financial momentum that will exist if the proposed pipeline is completed before the CEQA review is undertaken, which will "likely become nothing more than *post hoc* rationalizations to support action already taken" (*Laurel Heights*, *supra*, 47 Cal.3d at p. 394). For instance, if subsequent review demonstrates it is feasible to irrigate the 3,200 acres referred to in Sandridge's declarations with a pipeline smaller than 48 inches in diameter, it is unlikely SPUD would condition its approval of the easement only for a smaller pipeline, which would require the existing line to be removed and replaced—acts which would require physical changes to the environment that would be avoided by allowing the 48-inch pipeline to remain in place.

Sandridge argues SPUD has no jurisdiction over Sandridge's pumping and transportation of groundwater and, therefore, SPUD has no authority to mitigate or avoid any environmental impacts of the proposed pipeline. Based on this erroneous view of SPUD's authority and responsibilities under CEQA, Sandridge contends any remedy ordering SPUD to complete an environmental review of the private project would be a meaningless act. Sandridge's view of SPUD's authority is erroneous because it contradicts Guidelines section 15041, subdivision (a), which states that "[a] lead agency for a project has authority to require feasible changes in any or all activities involved in the project in order to substantially lessen or avoid significant effects on the environment,

---

[3]We recognize the injunction in the trespass action might lessen the harms on both sides even though it addresses only that portion of the proposed pipeline crossing TLCC's right of way.

consistent with applicable constitutional requirements." In other words, a lead agency has the power to condition its approval of the project on the adoption of a feasible alternative or feasible mitigation measures. The trial court correctly identified this authority and an agency's obligation to mitigate or avoid significant environmental impacts not just on the agency's own property but on the environment. (See *City of San Diego v. Board of Trustees of California State University* (2015) 61 Cal.4th 945, 957.) Accordingly, Sandridge's argument about SPUD's jurisdiction does not demonstrate the error in balancing the relative harms was harmless. Instead, it simply illustrates Sandridge's misunderstanding of CEQA.

Based on circumstances presented, we conclude there is a reasonable probability TLCC would have obtained a preliminary injunction if the harm to the public interest had been recognized and included in the relative balance of harms of erroneously issuing or denying a preliminary injunction. We further conclude the appropriate appellate relief is to reverse and remand TLCC's preliminary injunction request for further proceedings. In the typical case, the balancing of relative harms, which involves the exercise of discretion, is best completed in the first instance by the trial court rather than a court of review. (See *Right Site Coalition v. Los Angeles Unified School Dist.*, *supra*, 160 Cal.App.4th at p. 345.) Unlike *King v. Meese*, *supra*, 43 Cal.3d 1217, this is not a case where the parties have argued there are no contested factual questions necessary to resolve the request for a preliminary injunction. (*Id.* at p. 1228.)

### DISPOSITION

The April 4, 2022, order denying TLCC's request for a preliminary injunction is reversed. The matter is remanded to the trial court to vacate that order and reconsider TLCC's application for preliminary injunction in accordance with the principles set forth in this opinion. Pending the determination of the application for preliminary injunction, the stay imposed by our May 20, 2022, issuance of a writ of supersedeas shall remain in full force and effect. As a result, the restraining order set forth in the Second Amended

37.

Order After Hearing shall remain in effect until a decision is rendered on the application for preliminary injunction.  TLCC shall recover its costs on appeal.


                                                                    PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


MEEHAN, J.